Rebecca Noblin
Jeremy C. Lieb
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: rnoblin@earthjustice.org
E: jlieb@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society et al.*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

NATIONAL AUDUBON SOCIETY, CENTER FOR
BIOLOGICAL DIVERSITY, FRIENDS OF THE
EARTH, and STAND.EARTH,

     *Plaintiffs*,

       v.

DAVID BERNHARDT, in his official capacity as
Secretary of the Interior; WILLIAM P. PENDLEY,
in his official capacity as Deputy Director, Policy and
Programs, exercising the authority of the Director of
the Bureau of Land Management; CHAD B.
PADGETT, in his official capacity as Alaska State
Director of Bureau of Land Management; UNITED
STATES DEPARTMENT OF THE INTERIOR; and
BUREAU OF LAND MANAGEMENT,

     *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:20-cv-00206-TMB

# COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
# (42 U.S.C. § 4332)

# INTRODUCTION

1.      This action arises from the Bureau of Land Management's (BLM) revision of the Integrated Activity Plan (Plan) for the National Petroleum Reserve-Alaska (Reserve), opening up millions of currently protected acres in the most fragile and valuable parts of the Reserve to new oil and gas leasing, exploration, and development. BLM's final environmental impact statement (EIS) fails to comply with the agency's obligations under the National Environmental Policy Act (NEPA).

2.      The 23-million-acre Reserve is ecologically rich and supports a diversity of wildlife that has fed and supported cultural traditions for Alaska Native peoples for thousands of years.  Areas the revised Plan targets for increased industrial oil and gas activities are recognized as a globally important ecological resource, home to a diversity of species, including bears, muskoxen, caribou, and millions of migratory birds.  The lakes and lagoons of the Reserve, including Teshekpuk Lake, are the birthplace of millions of birds that fly to all 50 states and five continents.  Under the revised Plan, Teshekpuk Lake and areas surrounding many of the Reserve's other lakes and lagoons will be opened for leasing to oil companies.  The Reserve provides calving, insect relief, and migration areas for the Western Arctic and Teshekpuk Caribou Herds, which provide vital subsistence resources for more than 40 communities in northern and western Alaska. The revised Plan will open much of these herds' previously protected habitats to leasing. Coastal areas of the Reserve to be opened for leasing provide designated critical habitat

for polar bears and important habitat for other marine mammals, including Pacific walruses and ice seals.

3. BLM's revised Plan will open up millions more acres to oil and gas leasing, many of which are in designated Special Areas that have been protected up until now for their world-class value to wildlife and subsistence. BLM projects that oil production, surface disturbance, gravel and water use, and greenhouse gas emissions could roughly double compared to the prior Plan. The projected proliferation of oil and gas activities under the revised Plan will increase negative impacts to the Reserve's ecosystem, significantly affecting the people and wildlife in the Reserve and beyond.

4. BLM's final EIS does not analyze or describe the full scale of impacts the revised Plan will bring to the Reserve, nor does it assess specifically the full impacts of the entire breadth of actions it purports to cover, actions that include holding annual lease sales in the Reserve for the next two decades. BLM failed to take a hard look at the significant impacts of the revised Plan on the climate and on the resources of the Reserve, and it failed to consider reasonable alternatives, in violation of NEPA.

5. The Secretary of the Interior has not issued a record of decision for the Plan as of the filing of this complaint on August 24, 2020.

6. The Naval Petroleum Reserves Production Act (NPRPA) provides that "[a]ny action seeking judicial review of the adequacy of any program or site-specific environmental impact statement . . . concerning oil and gas leasing in the National Petroleum Reserve-Alaska shall be barred unless brought in the appropriate District

Court within 60 days after notice of the availability of such statement is published in the Federal Register." 42 U.S.C. § 6506a(n)(1).

7.      Plaintiffs do not concede that this requirement applies when an agency fails to publish a record of decision within 60 days after publishing a final EIS. Plaintiffs nevertheless file this complaint within 60 days after June 26, 2020, the date notice of availability of the final EIS was published in the Federal Register, 85 Fed. Reg. 38,388 (June 26, 2020), in order to ensure all of Plaintiffs' claims are preserved.

8.      This complaint challenges the final EIS that BLM has indicated will support its record of decision. Once BLM publishes the record of decision, Plaintiffs intend to file an amended complaint expanding and detailing the claims alleged in this complaint, including claims against the record of decision.

## JURISDICTION & VENUE

9.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 2201-2202. Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

10.     Plaintiff National Audubon Society (Audubon), founded in 1905, is a not-for-profit corporation organized under the laws of the State of New York, with its headquarters office in New York, New York, and a state office in Anchorage, Alaska. Audubon also has over 450 local chapters around the country, including five chapters in Alaska. Audubon's mission is to protect birds, and the places they need, today and tomorrow, throughout the Americas using science, advocacy, education, and on-the-

ground conservation. Audubon has 1.9 million members nationwide, including approximately 4,800 members in Alaska. Audubon has been actively involved in advocating for protection of the biological resources in the Reserve since 1977, and was instrumental in advocating for the boundaries of the areas protected from oil and gas activities under the 2013 Integrated Activity Plan.

11.     Plaintiff Center for Biological Diversity (the Center) is a national, non-profit organization, with offices across the country and in La Paz, Mexico. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 81,800 members. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of the Arctic and wildlife threatened by oil and gas leasing, exploration, and development. As part of these efforts, the Center works to protect Arctic wildlife that lives in and near the Reserve from the numerous harms inherent in oil and gas leasing, exploration, and development, including noise pollution, habitat destruction, oil spills, and greenhouse gas pollution that exacerbates the climate crisis.

12.     Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. Friends of the Earth is a membership organization consisting of nearly 178,000 members, including more than 400 members who live in Alaska, and more than 1.7 million activists nationwide. Friends of the Earth is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74

countries worldwide.  Friends of the Earth's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world. Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals.  Friends of the Earth is concerned about the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including in the Reserve, have on the climate and people, fish, birds, and other species that depend on this region.  Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence U.S. energy and environmental policies affecting Alaska's Arctic.

13.     Stand.earth (Stand) is an international advocacy organization that works to create a world where respect for people and the environment comes first.  It does so by challenging corporations and governments to treat people and the environment with respect because our lives depend upon it.  Stand's campaigns challenge destructive corporate practices and governmental policies, demand accountability, and create solutions among diverse constituencies.  Some of Stand's recent campaigns focus on the urgent need to transition away from fossil fuels, including oil; advocate for no further expansion of fossil fuel infrastructure; protect the Arctic, Amazon, and Athabasca from pressure to expand oil drilling; halt the use and carriage of heavy fuel oil in Arctic waterways, including Alaska's Western Arctic shoreline; and ensure that the Arctic National Wildlife Refuge remains free from fossil fuel extraction.

14.     Members of plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve for various purposes, including subsistence activities, recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment.  Members of plaintiff groups also use or otherwise enjoy migratory wildlife that depend on the Reserve.  Opening more of the Reserve's wildlife habitat and special places to fossil fuel development, as analyzed in BLM's final EIS, will directly and irreparably injure these interests.

15.     Plaintiffs submitted comments to BLM on the Plan's draft EIS.  Each of the plaintiff groups monitors the use of public lands in the Reserve and compliance with the laws respecting these lands, educates its members and the public concerning the management of these lands, and advocates policies and practices that protect the natural and cultural values and sustainable resources of these lands.  It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands.  The interests and organizational purposes of the plaintiffs will be directly and irreparably injured by Defendants' violations of law as described in this complaint.

## DEFENDANTS

16.     Defendant David Bernhardt is the Secretary of the United States Department of the Interior.  He is sued in his official capacity.

17.     Defendant William Perry Pendley is the official who is exercising the authority of the Director of BLM.  He is sued in his official capacity.  Mr. Pendley is

responsible for the supervision and management of all decisions, operations, and activities of BLM.

18.     Defendant Chad B. Padgett is the Alaska State Director of BLM.  He is sued in his official capacity.

19.     Defendant United States Department of the Interior is an agency of the United States responsible for oversight of BLM.

20.     Defendant BLM is an agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve.

## STATUTORY FRAMEWORK

## I.     The Naval Petroleum Reserves Production Act

21.     In 1976, Congress passed, and subsequently amended in 1980, the NPRPA, which transferred jurisdiction over the Reserve from the Navy to the Secretary of the Interior, in recognition of the area's significant ecological value and the need to protect it. Pub. L. 94-258, Title I §§ 102-03, 90 Stat. 303-04 (codified at 42 U.S.C. §§ 6502-6503). The NPRPA created a management structure for the Reserve separate from other public land laws, including the Mineral Leasing Act.  42 U.S.C. § 6502 (withdrawal from entry and disposition under public land laws).

22.     Because of the world-class wildlife and subsistence values of the Reserve, the NPRPA requires the Secretary to balance any oil and gas leasing, exploration, and development it authorizes with protecting and conserving other resources and uses in the Reserve.  42 U.S.C. §§ 6504(a), 6506a(b).

23.     The NPRPA requires the Secretary to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the Reserve."  42 U.S.C. § 6506a(b).

24.     The NPRPA further requires the Secretary to provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value."  42 U.S.C. § 6504(a).  "Special areas" that require "maximum protection" are "areas within the [R]eserve identified by the Secretary of the Interior as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve."  43 C.F.R. § 2361.0-5(f).  BLM's regulations specifically name the Teshekpuk Lake, Utukok River Uplands, and Colville River Special Areas as possessing such values.  *Id.* § 2361.1(c).

## II.     The National Environmental Policy Act

25.     NEPA is the United States' basic national charter for protection of the environment.  It requires federal agencies to take a hard look at environmental consequences and consider less-damaging approaches before approving actions involving public resources.  42 U.S.C. §§ 4331-4347.  The Council on Environmental Quality has promulgated regulations implementing NEPA that are binding on federal agencies. 40 C.F.R. §§ 1500-1508.

26.     NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement, known as an EIS, must, among other things:  rigorously explore and objectively evaluate all reasonable alternatives; analyze all direct, indirect, and cumulative environmental impacts; and include a discussion of the means to mitigate adverse environmental impacts.  40 C.F.R. §§ 1502.14, 1502.16.

27.     Direct effects include those that "are caused by the action and occur at the same time and place."  40 C.F.R. § 1508.8(a).  Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8(b).  Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  *Id.* § 1508.7

28.     An agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).

## STATEMENT OF FACTS

## I.    Management of the Reserve and the 2013 Integrated Activity Plan

29.     BLM manages the lands, wildlife, and other values and uses of the Reserve, including any oil and gas activities in the Reserve, through a multi-step process.  It first

promulgates "activity plans," which are programmatic management plans that zone areas of the Reserve for various purposes, set aside lands for protection of surface values, and impose limits on the manner in which oil and gas activities may take place in those areas in which oil and gas leasing is permitted. It may next hold lease sales in specified tracts, which vary from sale to sale, in areas that the activity plans have designated as open for leasing. For areas where leases are sold, BLM then reviews exploration plans submitted by lessees, and, if oil or gas are discovered on the leases, it reviews development plans for developing and producing these fossil fuels.

30. In 2013, the Department of the Interior issued a comprehensive management plan covering the entire Reserve. This 2013 Plan designated approximately 52 percent (11.8 million acres) of the Reserve as available for oil and gas leasing, subject to requirements to protect other values, and prohibited altogether oil and gas leasing on approximately 11 million acres particularly valuable for wildlife habitat or for other uses. It expanded existing Special Areas, including the Teshekpuk Lake Special Area, and added the Peard Bay Special Area. The 2013 Plan's leasing prohibitions covered most of the lands within the five designated Special Areas.

31. The 2013 Plan made approximately 3.1 million acres in the Teshekpuk Lake Special Area unavailable for leasing to protect essential habitat for birds and caribou that are primary subsistence resources for Alaska Native communities.

32. In the southwestern portion of the Reserve, the 2013 Plan prohibited new non-subsistence infrastructure in 7.3 million acres to protect essential habitat for caribou

in the Western Arctic Herd. The 2013 Plan added approximately 3.1 million acres to the Utukok River Uplands Special Area "to more fully encompass prime calving and insect-relief habitat" within the Reserve.

33.     In the 2013 Plan, the purpose of the Colville River Special Area was modified "to protect all raptors, rather than the original intent of protection for arctic peregrine falcons." The Colville River and its wetlands provide the most important raptor nesting habitat on the North Slope, and are home to a variety of raptor species, including the gyrfalcon, golden eagle, and rough-legged hawk. The Colville River Delta also provides fish for subsistence users.

34.     BLM created the Peard Bay Special Area in the 2013 Plan to protect important marine mammal habitat and a high-use area for shorebirds and waterbirds. BLM recognized the importance of this coastal area of the Reserve for fish and marine mammals, and the coastal and riverine areas for subsistence. The 2013 Plan made the Peard Bay and Kasegaluk Lagoon Special Areas—as well as Elson Lagoon, Dease Inlet, Admiralty Bay, and other smaller inlets along the coast north and east of Teshekpuk Lake—unavailable for leasing to minimize the risk of an oil spill or other disturbance.

## II.     The Revised Plan Final EIS

35.     In 2017, the Secretary of the Interior signed Secretarial Order 3352, which directed that the 2013 Plan be revised to allow for more oil and gas leasing in the Reserve. BLM began a NEPA scoping process and, on November 21, 2019, released a draft EIS for the revised Plan. The draft EIS considered four alternatives — one no

action alternative and three action alternatives.  Alternative A, the no-action alternative, would leave the 2013 Plan in place; Alternative B would open 50 percent (11.4 million acres) of the Reserve to oil and gas leasing; Alternative C would open 75 percent (17.1 million acres); and Alternative D would open 81 percent (18.3 million acres).  The same stipulations and required operating procedures applied across the action alternatives, and all three action alternatives abolished the Colville River Special Area.

36.     On June 26, 2020, BLM published a final EIS for the revised Plan.  The final EIS considers five alternatives—Alternative A (no-action alternative), a modified version of each of the three action alternatives that were considered in the draft EIS (Alternatives B, C, and D), and a new, preferred alternative (Alternative E).  Each of the action alternatives the final EIS considers would allow continued expansion of oil and gas leasing in the Reserve.  BLM's preferred Alternative E would open 82 percent (more than 18.5 million acres) of the land in the Reserve to leasing, including many of the Reserve's most special and fragile landscapes such as the Teshekpuk Lake area.  The increase in leasing described in preferred Alternative E equates to approximately 6.7 million more acres being open to oil and gas activities in the Reserve, affecting many Special Areas and the values they protect.  The final EIS does not recognize that recent scientific information indicates that the Reserve deserves more protection, not less.

37.     The preferred Alternative E would open all of the previously protected Teshekpuk Lake Special Area to oil and gas activities.  This area provides some of the most important waterfowl nesting habitat in the Arctic.  For example, the Teshekpuk

Lake watershed provides nesting habitat for many migratory waterfowl species, including northern pintails, long-tailed ducks, king eiders, Pacific brant, greater white-fronted geese, tundra swans, and three species of loons—Pacific, red-throated, and yellow-billed. The Teshekpuk Lake Special Area provides essential molting habitat for significant populations of migratory Pacific brant, greater white-fronted geese, and Canada geese. Spectacled and Steller's eiders, both listed as threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531-1544, have relatively high nesting densities in areas around Teshekpuk Lake.

38.    Opening the Teshekpuk Lake Special Area to oil and gas leasing could have significant impacts for the millions of birds from all over the world that nest there. These birds are vulnerable to the effects of oil and gas development.  Gravel mining and deposition necessary for constructing oil and gas infrastructure destroys bird habitat, encroaching upon molting areas for brant and nesting grounds for ducks, geese, and shorebirds near Teshekpuk Lake.  Aircraft flying at low altitudes may disturb molting geese near the lake.  Molting demands energy and leaves geese flightless, making them especially vulnerable to disruptions, and some never become habituated to human activities.  BLM does not adequately analyze these impacts from opening the Teshekpuk Lake region to oil and gas activities.

39.    The Teshekpuk Lake Special Area also encompasses major calving grounds for the 56,000 caribou of the Teshekpuk Caribou Herd.  The population has declined

from a high of nearly 69,000 in 2008. This caribou herd is an important food resource for local Alaska Native families.

40.     The Teshekpuk Caribou Herd and other resources in and around the Teshekpuk Lake Special Area sustain the primarily Iñupiat community of Nuiqsut. Nuiqsut is situated on the eastern border of the Reserve, along the Colville River, about 35 miles south of the Beaufort Sea coast. Community members depend on the fish and wildlife of the Reserve, especially in areas within and near the Teshekpuk Lake Special Area, for essential traditional subsistence hunting, trapping, and fishing activities. Traditional hunting, trapping, and fishing practices—and the traditions of sharing and passing these practices to future generations—are critical to the community's health, well-being, and cultural identity. Caribou hunting in the area, particularly in the winter, is especially important.

41.     The revised Plan described in preferred Alternative E, along with Alternatives C and D, would also open the previously protected Utukok River Uplands Special Area to oil and gas activities. The Utukok River Uplands Special Area provides key habitat for the Western Arctic Herd, including during critical calving, insect-relief, and migration periods. It is also home to brown bears, wolverines, raptors, moose, and wolves. The area is an important subsistence use area and provides excellent opportunities for recreation and study of natural flora and fauna. The Utukok River Uplands Special Area also protects the headwaters of many of the Reserve's pristine rivers, including the Colville River.

42.     Allowing oil and gas infrastructure in key caribou habitat in the Teshekpuk Lake and Utukok River Uplands Special Areas, as allowed under preferred Alternative E and other action alternatives in the final EIS, could have significant adverse effects on caribou.  It could cause shifts in distribution, potentially driving caribou to low quality habitats, and causing reduced calf survival and affecting herd growth rates.  Oil and gas infrastructure in Teshekpuk Lake and in the Utukok River Uplands Special Areas could displace caribou from areas that are essential for calving, rearing, insect relief, and migration.  Winter oil and gas activities could also disturb or displace caribou overwintering in the Reserve, resulting in increased energy expenditures during an already difficult time of year.  BLM did not take a hard look at these potential impacts to caribou and other species from opening the Teshekpuk Lake and Utokok River Uplands Special Areas to oil and gas activities.

43.     All of the action alternatives in the final EIS, including the preferred Alternative E, remove the Colville River Special Area.  The Colville River is the largest of Alaska's rivers that flow to the Arctic Ocean.  It is an essential source of food and a mode of travel for Alaska Native subsistence hunters.  The river and its tributaries provide important habitat for moose, brown bears, wolves, wolverines, and at least twenty species of anadromous and freshwater fish.  It is a spectacularly scenic area with substantial recreation values.  The Colville River is known for high concentrations of songbirds and birds of prey, including arctic peregrine falcons, gyrfalcons, and rough-

legged hawks. It is recognized as one of the most significant regional habitats for raptors in North America.

44. Removing protections for this area has the potential to significantly affect the raptors that depend on it, as well as the subsistence traditions of Alaska Native peoples. Industrial infrastructure located near the Colville River could compromise raptor nest sites and impair foraging habitats such as ponds, lakes, wetlands, and streambanks. Gravel mining from cliffs along the river would likely destroy nesting habitat. Power lines can electrocute raptors. Motorized vehicles, aircraft, heavy equipment, and seismic surveys may disturb nesting arctic peregrine falcons and gyrfalcons. Moose and muskoxen that concentrate along the Colville River in winter could expend precious energy to avoid seismic surveys and exploratory drilling activities. Pipelines near the river may impede moose movements. BLM has not taken a hard look at these potential impacts of removing the Colville River Special Area.

45. BLM's preferred Alternative E would open additional areas for leasing along the coastal and lagoon areas of the Reserve. The coastal areas include subsistence areas for Alaska Native peoples, and provides important habitat for high densities of a multitude of species of birds, including the Spectacled and Steller's eiders. The coastal waters are critical to various marine mammals, including bowhead and beluga whales, spotted seals, and Pacific walruses. The coast also provides the sea ice and habitat conditions to support polar bear denning areas and other critical polar bear habitat. In addition, the Teshekpuk Caribou Herd depends on the Reserve's coastal areas throughout

the year for calving and post-calving, for shelter during the winter months, and for insect relief.

46.    Opening these coastal and lagoon areas to oil and gas activities may significantly affect wildlife, including birds, marine mammals, and caribou, as well as subsistence practices.  It significantly increases the probability that infrastructure development may interfere with polar bear denning habits.  BLM has not taken a hard look at these potential impacts of opening these coastal areas to oil and gas activities.

47.    The final EIS estimates that the preferred Alternative E could result in the extraction and burning of approximately 2.6 billion barrels of oil, resulting in nearly one gigaton of $CO_2$ emissions over the next 70 years.  The final EIS, however, fails to take a hard look at the impacts of those emissions in the context of climate change globally and in the Arctic, and it fails to adequately discuss the significance of greenhouse gas emissions from expanding oil and gas production in the Reserve under the revised Plan.

48.    The final EIS did not consider any alternatives that would increase protections over the 2013 Plan.  All action alternatives in the final EIS open more areas to oil and gas activities and increase impacts over the status quo.  In the final EIS, each of the action alternatives (B, C, D, and E) eliminate the Colville River Special Area and, while expanding the Teshekpuk Lake Special Area further west, eliminate the southern portion of Teshekpuk Lake Special Area and shrink the total acreage protected as a Special Area.  All of the action alternatives either open all or a significant portion of the

Teshekpuk Lake Special Area, or allow pipeline corridors to be developed through the Teshekpuk Lake Special Area.

49. Though BLM presented Alternative B as a more environmentally conservative alternative, for every development scenario in the final EIS, Alternative B would result in increased production of oil, surface disturbance, and gravel and water use, as compared to the no-action alternative. It would also result in increased production and downstream emissions over the no-action alternative. This is primarily because most of the land purportedly protected by Alternative B is already under existing lease.

50. Several comments on the draft EIS implored BLM to consider a no new leasing alternative, another more protective alternative than the no-action alternative (*i.e.*, the 2013 Plan), or an alternative that required existing lessees to undertake phased or limited development. BLM did not consider any of these alternatives.

51. BLM did not consider a more protective alternative in the final EIS. BLM did, however, make several changes between the draft and the final EIS leading to greater potential oil development, including adding a preferred Alternative E and reducing some protections in the other action alternatives. These changes were not subject to public review or comment before the final EIS was finalized, nor do they appear to be responsive to public comments on the draft EIS.

52. For example, BLM's final EIS increased the area open for leasing under several alternatives compared to the amount of area evaluated in the draft EIS. BLM's preferred Alternative E would increase the area available for leasing by approximately

329,000 acres over any alternative discussed in the draft EIS. Similarly, Alternatives C and D were modified in the final EIS to each allow approximately 257,000 more acres for potential leasing than was discussed for these alternatives in the draft EIS.

53.     Among other areas, the preferred alternative, as well as Alternatives C and D, in the final EIS, newly make available for leasing and infrastructure lands in the southern portion of the Utukok River Uplands Special Area.

54.     BLM states in the final EIS that it plans to conduct no additional NEPA analysis for lease sales, stating that the final EIS "is intended to fulfill NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter." The final EIS, however, does not consider lease sale alternatives (*i.e.*, various configurations of lease sales in various years), nor does it attempt to analyze or compare the impacts of different lease sale alternatives. As discussed above, the alternatives the final EIS considers simply zone certain areas as available or unavailable for leasing and set out restrictions and best management practices in the areas that are open. The impacts analyses for each action alternative are on a massive scale, covering roughly 50 percent (Alternative B), 75 percent (Alternative C), and more than 80 percent (Alternatives D and E) of the Reserve, rather than at the scale of impacts associated with potential future lease sales covering specific areas of the Reserve.

**CLAIM FOR RELIEF (NEPA)**

55.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 54.

56.     NEPA requires federal agencies to prepare an EIS on any proposal for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

57.     An EIS must include "a detailed statement" that includes and analyzes the significance of all reasonably foreseeable direct, indirect, and cumulative impacts to the environment of the proposed action along with reasonable alternatives to the proposed action.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500-08.

58.     Defendants failed to provide an adequate analysis of direct, indirect, and cumulative impacts from, and reasonable alternatives to, the Plan and any lease sales held in reliance on the final EIS, in violation of NEPA, 42 U.S.C. § 4332(2)(C), and its implementing regulations, 40 C.F.R. §§ 1500.2, 1502.1, 1502.14, 1502.16, 1505.1(e).

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court:

A.     Declare that Defendants have violated NEPA, and further declare that the actions set forth above are arbitrary, capricious, and not in accordance with law and procedure required by law;

B.     Set aside Defendants' final EIS for the Plan and any actions taken by Defendants in reliance on the final EIS; and

C.      Grant such other relief as the Court considers just and proper, including

Plaintiffs' costs of this action and such reasonable attorneys' fees as they are entitled to.

Respectfully submitted this 24th day of August, 2020.

*s/ Rebecca Noblin*
Rebecca Noblin (Alaska Bar No. 0611080)
EARTHJUSTICE

*s/ Jeremy Lieb*
Jeremy C. Lieb (Alaska Bar No. 1810088)
EARTHJUSTICE

*s/ Eric Jorgensen*
Eric P. Jorgensen (Alaska Bar. No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs National Audubon Society,*
*Center for Biological Diversity, Friends of the*
*Earth, and Stand.earth*