Jeremy C. Lieb
Ian S. Dooley
Erik Grafe
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org
E: idooley@earthjustice.org
E: egrafe@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs National Audubon Society et al.*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NATIONAL AUDUBON SOCIETY, CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, and STAND.EARTH, <br><br> *Plaintiffs*, <br><br> v. <br><br> DEB HAALAND, in her official capacity as Secretary of the Interior; TRACY STONE-MANNING, in her official capacity as the Director of the Bureau of Land Management; STEVE COHN, in his official capacity as Alaska State Director of Bureau of Land Management; UNITED STATES DEPARTMENT OF THE INTERIOR; and BUREAU OF LAND MANAGEMENT, <br><br> *Defendants*, <br><br> and <br><br> STATE OF ALASKA, <br><br> *Intervenor-Defendant*. | Case No. 3:20-cv-00206-SLG |

## SECOND AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF
## (42 U.S.C. § 4332)

1.      This action arises from the Bureau of Land Management's (BLM) June 2020 final environmental impact statement (2020 EIS) for the National Petroleum Reserve-Alaska (Reserve) Integrated Activity Plan and subsequent decisions relying on that 2020 EIS.  In December 2020, BLM issued a record of decision (2020 decision) opening millions of previously protected acres in the most fragile and ecologically and culturally important parts of the Reserve to new oil and gas leasing, exploration, and development.  In April 2022, after Plaintiffs initiated this lawsuit, BLM issued a new record of decision (2022 decision) reinstating most of the provisions of the 2013 integrated activity plan (2013 plan), which was in place before 2020.  Both decisions relied on the 2020 EIS.

2.      The 2020 EIS fails to comply with the agency's obligations under the National Environmental Policy Act (NEPA).  Specifically, it originally purported "to fulfill NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter."  It is inadequate for this purpose in at least two respects.  First, it fails NEPA's requirement to examine alternatives that explore when, where, and under what conditions BLM may hold individual lease sales.  Second, it fails NEPA's requirement to analyze the effects lease sales may have on climate change.

3.      Although BLM has not yet decided to hold a lease sale in reliance on the 2020 EIS, the statute of limitations in the Naval Petroleum Reserves Production Act (NPRPA), 42 U.S.C. § 6506a(n)(1), compels Plaintiffs to challenge the adequacy of the

EIS for any future lease sales now.

4.  The provision states: "[a]ny action seeking judicial review of the adequacy of any program or site-specific environmental impact statement . . . concerning oil and gas leasing in the [Reserve] shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register."  42 U.S.C. § 6506a(n)(1).

5.  Where the intended scope of an EIS encompasses future lease sales, the statute of limitations for challenging the adequacy of the EIS's analysis of those future lease sales runs from publication of the notice of availability of the EIS, regardless of when the agency makes the decision to hold the sales.  *N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 965 F.3d 705, 724 (9th Cir. 2020).

6.  Plaintiffs filed a challenge to the 2020 EIS by filing their first complaint on August 24, 2020, within 60 days after June 26, 2020, the date notice of availability of the 2020 EIS was published in the Federal Register, 85 Fed. Reg. 38,388 (June 26, 2020).

7.  BLM has issued an errata sheet to the 2020 EIS that states "[t]his programmatic IAP/EIS is not intended to, by itself and without further NEPA analysis, fulfill NEPA requirements for future lease sales."  However, this action does not ensure that judicial review of BLM's compliance with NEPA will be available under the NPRPA in the future.  Nothing precludes BLM from reversing course by revising the EIS to cover lease sales again or asserting in a future lease sale decision that the 2020 EIS covers lease sales notwithstanding the errata and arguing that section 6506a(n)(1) bars

judicial review of the EIS's adequacy for the sales.

8. BLM could ensure that review will be available in the future. For example, it could commit to issuing a new notice of availability of the 2020 EIS, resetting the clock for judicial review under section 6506a(n)(1), if it were to revise the 2020 EIS in the future or rely on it as the NEPA analysis for a future lease sale.

9. Absent assurance that BLM's compliance with NEPA for future lease sales will be subject to judicial review, Plaintiffs are compelled by section 6506a(n)(1) to pursue their claims that the EIS fails to satisfy NEPA for future lease sales at this time.

10. Plaintiffs ask this Court to enforce BLM's obligations under NEPA by declaring that the 2020 EIS fails to fulfill the requirements of NEPA for lease sales in the Reserve, vacating the 2020 EIS as applied to future lease sales, and vacating in part Defendants' 2022 decision only to the extent it authorizes future lease sales without additional NEPA analysis.

## JURISDICTION & VENUE

11. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 2201-02. Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

12. Plaintiff National Audubon Society (Audubon), founded in 1905, is a not-for-profit corporation organized under the laws of the State of New York, with its headquarters office in New York, New York, and a state office in Anchorage, Alaska. Audubon also has over 450 local chapters around the country, including five chapters in

Alaska. Audubon's mission is to protect birds, and the places they need, today and tomorrow, throughout the Americas, using science, advocacy, education, and on-the-ground conservation. Audubon has 1.7 million members nationwide, including approximately 4,800 members in Alaska. Audubon has been actively involved in advocating for protection of the biological resources in the Reserve since 1977, and was instrumental in advocating for the boundaries of the areas protected from oil and gas activities under the 2013 plan.

13. Plaintiff Center for Biological Diversity ("the Center") is a national, non-profit organization, with offices across the country and in La Paz, Mexico. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 89,000 members. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of the Arctic and wildlife threatened by oil and gas leasing, exploration, and development. As part of these efforts, the Center works to protect Arctic wildlife that lives in and near the Reserve from the numerous harms inherent in oil and gas leasing, exploration, and development, including noise pollution, habitat destruction, oil spills, and greenhouse gas pollution that exacerbates the climate crisis.

14. Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. Friends of the Earth is a membership organization consisting of over 225,000 members, including more than 550 members who live in Alaska, and

more than 5 million activists nationwide.  Friends of the Earth is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide.  Friends of the Earth's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world. Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals.  Friends of the Earth is concerned about the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including in the Reserve, have on the climate and people, fish, birds, and other species that depend on this region.  Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence United States energy and environmental policies affecting Alaska's Arctic.

15.     Plaintiff Stand.earth (Stand) is an international advocacy organization that works to create a world where respect for people and the environment comes first.  It does so by challenging corporations and governments to treat people and the environment with respect because our lives depend upon it.  Stand's campaigns challenge destructive corporate practices and governmental policies, demand accountability, and create solutions among diverse constituencies.  Some of Stand's recent campaigns focus on the urgent need to transition away from fossil fuels, including oil; advocate for no further expansion of fossil fuel infrastructure; protect the Arctic, Amazon, and Athabasca from pressure to expand oil drilling; halt the use and carriage of heavy fuel oil in Arctic waterways, including Alaska's Western Arctic shoreline; and ensure that the Arctic

National Wildlife Refuge remains free from fossil fuel extraction.

16.     Members of plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve, including areas that that remain open to oil and gas leasing under the 2022 decision.  Plaintiff groups' members use and enjoy these areas for various purposes, including subsistence activities, recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment.  Members of plaintiff groups also use or otherwise enjoy migratory wildlife that depend on the Reserve, including caribou, polar bears, and birds.  Fossil fuel leasing, exploration, and development in these areas will directly and irreparably injure these interests.

17.     Plaintiffs submitted comments to BLM on the 2020 draft EIS for the Reserve integrated activity plan.  Each of the plaintiff groups monitors the use of public lands in the Reserve and compliance with the laws respecting these lands, educates its members and the public about the management of these lands, and advocates policies and practices that protect the natural and cultural values and sustainable resources of these lands.  It is impossible for the plaintiff groups to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands.  The interests and organizational purposes of the plaintiffs will be directly and irreparably injured by Defendants' violations of law as described in this complaint.

## DEFENDANTS

18.     Defendant Deb Haaland is the Secretary of the United States Department of

the Interior (Secretary). She is sued in her official capacity.

19.     Defendant Tracy Stone-Manning is the Director of BLM. She is sued in her official capacity.

20.     Defendant Steve Cohn is the Alaska State Director of BLM. He is sued in his official capacity.

21.     Defendant United States Department of the Interior (Interior) is an agency of the United States responsible for oversight of BLM.

22.     Defendant BLM is an agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve.

STATEMENT OF FACTS

I.     **The Reserve**

23.     In 1976, Congress passed the NPRPA, which transferred jurisdiction over the Reserve from the Navy to the Secretary of the Interior, in recognition of the area's significant ecological value and the need to protect it. Pub. L. 94-258, Title I §§ 102-03, 90 Stat. 303-04 (codified at 42 U.S.C. §§ 6502-03). The NPRPA created a management structure for the Reserve separate from other public land laws, including the Mineral Leasing Act. 42 U.S.C. § 6502 (withdrawal from entry and disposition under public land laws).

24.     As originally enacted, the NPRPA allowed exploration but prohibited leasing until authorized by an act of Congress. Pub. L. 94-258, § 104(a). In 1980, Congress amended the NPRPA to remove this prohibition and authorized the Secretary of

the Interior to conduct an "expeditious program of competitive leasing" within the Reserve.  Pub. L. No. 96-514, Title I § 107, 94 Stat. 2957 (1980) (codified at 42 U.S.C. § 6506a(a)).

25.    Nonetheless, because of the world-class wildlife and subsistence values of the Reserve, the NPRPA requires the Secretary to protect and conserve other resources and uses in the Reserve whenever the Secretary authorizes oil and gas leasing, exploration, or development.  42 U.S.C. §§ 6504(a), 6506a(b).

26.    The NPRPA requires the Secretary to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]."  *Id.* § 6506a(b)

27.    The NPRPA further requires the Secretary to provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value."  *Id.* § 6504(a).  "Special areas" are "areas within the [R]eserve identified by the Secretary of the Interior[] as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve."  43 C.F.R. § 2361.0-5(f).

## II.    Climate change and the Arctic

28.    Since Congress opened the Reserve to leasing, scientists have learned more about the relationship between the burning of fossil fuels and greenhouse gases and

climate change. The world is already experiencing impacts from climate change, with drought and extreme weather events becoming increasingly common. Climatic change and greenhouse gas emissions are having dramatic impacts on plant and animal species and habitats, threatening both humans' and other species' resiliency and ability to adapt to these changes.

29. The effects of warming in Arctic Alaska have been especially severe. Alaska has warmed more than twice as fast as the rest of the United States over the past 60 years, and the Arctic is expected to warm by an additional 5.6°C to 6.7°C this century. This rapid warming presents myriad disruptions to Arctic ecosystems, including in the Reserve. In the Arctic, climate change is causing, and will continue to cause, sea-level rise, sea-ice melt, river flow changes, and permafrost thaw.

30. Extensive research demonstrates the urgent need to reduce greenhouse gas emissions on an enormous scale. Greenhouse gases can linger in the atmosphere for centuries. The effects of new greenhouse gas emissions can therefore be cumulative and non-linear, with each additional unit of emissions inflicting greater environmental damage. Because of greenhouse gases' cumulative nature, the impacts from emissions can be higher every year even though the overall level of emissions has decreased.

31. To prevent catastrophic impacts to humans and other life on Earth, global emissions must rapidly decline and reach net-zero in several decades. According to the Intergovernmental Panel on Climate Change, to limit warming below 1.5°C, a level beyond which impacts from warming may be catastrophic to humans and other life on

Earth, global emissions must decline by 45 percent relative to 2010 levels by 2030 and reach net-zero by 2050.

32.    This necessary transition leaves no room in the global carbon budget for developing new fossil fuel discoveries, especially in the Arctic. The potential greenhouse gas emissions from already-leased United States federal lands would exhaust the remaining United States carbon budget consistent with a minimum 1.5°C warming target. The Intergovernmental Panel on Climate Change provides a range of various global emission scenarios over time against which the significance of the integrated activity plan's emissions can be compared.

33.    The United States has recognized the urgent imperative to act to reduce greenhouse gas emissions. For example, in Executive Order 14008, President Biden recognized that addressing the climate crisis is "more necessary and urgent than ever" and committed to deploying the "full capacity" of agencies "to implement a Government-wide approach" to combat the climate crisis. The United States has committed to reduce greenhouse gas (GHG) emissions by 50–52 percent below 2005 levels in 2030, and to reach net-zero emissions by 2050.

## III.    Management of the Reserve and the 2013 Plan

34.    BLM manages the lands, wildlife, and other values and uses of the Reserve, including any oil and gas activities, through a multi-step process. It first promulgates "activity plans," which are programmatic management plans that zone areas of the Reserve for various purposes, set aside lands for protection of surface values, and impose

limits on how oil and gas activities may take place in those areas where oil and gas leasing is permitted. BLM may next hold lease sales in specified tracts, which vary from sale to sale, in areas that the activity plans have designated as open for leasing. For areas where leases are sold, BLM then reviews exploration plans submitted by lessees, and, if oil or gas are discovered on the leases and development plans are put forward, BLM reviews development plans for developing and producing these fossil fuels.

35. In 2013, Interior issued its first integrated activity plan covering the entire 23-million-acre Reserve. This 2013 plan designated approximately 52 percent (11.8 million acres) of the Reserve as available for oil and gas leasing, subject to requirements to protect other values, and prohibited altogether oil and gas leasing on approximately 11 million acres particularly valuable for wildlife habitat or for other uses. The plan also prohibited most types of new permanent infrastructure (including pipelines, gravel drilling pads, and other infrastructure built to support commercial oil and gas activities) on approximately 8.4 million acres of the Reserve.

36. Between 2013 and 2019, BLM held annual lease sales in the Reserve under this plan. Each of these lease sales offered different numbers and configurations of tracts within the areas classified as open to leasing. No lease sale during this time offered all tracts open for leasing under the 2013 Plan. Lease purchases included lands in and around the Teshekpuk Lake and Colville River Special Areas. Some leaseholders have expressed plans to expand their oil and gas infrastructure westward.

## IV. The 2020 EIS

37.     In 2017, the Secretary signed Secretarial Order 3352, which directed BLM to review and develop a revised Integrated Activity Plan.

38.     BLM began a NEPA scoping process and, on November 21, 2019, released a draft EIS for a revised Plan.

39.     On June 26, 2020, BLM published a final EIS for the revised Plan (2020 EIS).  The 2020 EIS states that its purpose is to determine the appropriate management of BLM-managed lands in the Reserve.

40.     The 2020 EIS considers five programmatic alternatives that classify land as either opened or closed to leasing.  Each of the action alternatives the 2020 EIS considers would allow extensive leasing in the Reserve.  Alternative A, the no-action alternative, would leave the 2013 Plan in place; Alternative B would open 50 percent (11.4 million acres) of the Reserve to oil and gas leasing; Alternative C would open 75 percent (17.1 million acres); Alternative D would open 81 percent (18.3 million acres); and BLM's preferred Alternative E would open 82 percent (more than 18.5 million acres).  The same stipulations and required operating procedures apply across the action alternatives, and all action alternatives abolish the Colville River Special Area.

41.     The 2020 EIS states that "[t]he decisions evaluated in this IAP/EIS and its record of decision would authorize lease sales," and it originally stated that it was "intended to fulfill NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter." But it does not identify how BLM will decide

what lands to lease and when.

42.    The 2020 EIS states that its analysis of impacts assumes all tracts made available under each programmatic alternative will be offered during each lease sale. However, the EIS and record of decision do not dictate that all tracts will be offered during each lease sale, and BLM is free to use a phased approach and offer only a portion of available lands, as it has done in the past.

43.    The 2020 EIS does not consider alternatives for lease sales to be held in the future within the areas zoned by the Plan as open to leasing (*e.g.*, various configurations of areas offered for lease in various years based on different criteria and containing different conditions for leases).  Nor does it therefore attempt to analyze or compare the impacts of different lease sale alternatives.  It considers only alternatives for the planning level decision about which areas will be zoned for future leasing and oil exploration and development activities.

44.    The impacts analysis for each programmatic action alternative are on a massive scale, covering roughly 50 percent (Alternative B), 75 percent (Alternative C), and more than 80 percent (Alternatives D and E) of the Reserve, rather than at the scale of impacts associated with potential future lease sales covering specific areas of the Reserve.  The 2020 EIS's analysis of the different alternatives' comparative impacts on wildlife in special areas such as caribou, geese, and shorebirds, provides little additional content beyond the obvious point that the alternatives that open more land to future leasing and infrastructure could lead to more development and more environmental

impacts.

45.    The 2020 EIS estimates that under high development scenarios, the alternatives considered could result in the extraction and burning of between approximately 1.3 billion barrels of oil under Alternative A to 2.6 billion barrels of oil under Alternative E, causing between 466 million and nearly one billion tons of greenhouse gas emissions over the Plan's lifetime.

46.    The 2020 EIS discusses these emissions as a percentage of Alaska, United States, and global annual greenhouse gas inventories.  But it does not explain the significance of these numbers in the context of climate change and the need to reduce emissions overall to prevent significant adverse environmental impacts.  The 2020 EIS declines to use well-established methods for assessing the effects of greenhouse gas emissions, including the social cost of carbon.  The 2020 EIS's comparison of Plan emissions to domestic and global totals does not consider the potential United States and global change in annual emissions over the life of the Plan or explain why a comparison to a 2017 benchmark is rational.  Moreover, the 2020 EIS's focus on percentages based on a single year overlooks the incremental effect of greenhouse gas emissions.

47.    The 2020 EIS evaluates greenhouse gas emissions for each alternative based on "reasonably foreseeable development . . . scenarios" across the entire reserve and over the course of 70 years.  The 2020 EIS does not consider any lease sale alternatives, and therefore does include any estimate or analysis of emissions from such alternatives, nor does it otherwise attempt to analyze or compare emissions impacts from

different lease sale scenarios.

48.     Although BLM had not issued a record of decision, to ensure compliance with the NPRPA's 60-day statute of limitations for claims challenging the adequacy of an EIS concerning oil and gas leasing, Plaintiffs filed this lawsuit on August 24, 2020, within 60 days after June 26, 2020, the date notice of availability of the 2020 EIS was published in the Federal Register, 85 Fed. Reg. 38,388 (June 26, 2020).  ECF No. 1.

49.     This Court stayed all proceedings in this case until the Defendants issued a record of decision.  ECF No. 10.

**V.     The 2020 and 2022 Records of Decision**

50.     On December 31, 2020, the Secretary and the Alaska State Director of BLM signed the 2020 decision, selecting Alternative E with only minor modifications.

51.     The 2020 decision opened approximately 6.8 million more acres to oil and gas leasing in the Reserve.  The decision also allowed most types of new infrastructure in over 13 million acres, with an additional five million acres open to certain types of infrastructure such as essential pipeline crossings and roads.

52.     On February 15, 2021, Plaintiffs filed their first amended complaint in this case challenging the 2020 decision.  ECF No. 24.

53.     On March 11, 2021, Defendants moved to stay this case while new officials within Interior reviewed the 2020 decision.  ECF No. 27.

54.     The Court granted Defendants' motion.  ECF No. 28.

55.     Following two extensions of the stay in this case, ECF Nos. 30, 33, on

September 3, 2021, Interior Principal Deputy Assistant Secretary for Land and Minerals Management issued a memorandum to BLM stating: "While the Department has not yet decided whether to withdraw or replace the 2020 [integrated activity plan], our initial assessment indicates that the 2020 [integrated activity plan] is inconsistent with the policy set forth in Executive Order 13990. Accordingly, the Department believes that other alternatives, may better serve the policy set forth in Executive Order 13990." ECF No. 34-1 at 3. The memorandum directed BLM "to undertake an evaluation of the 2020 IAP/EIS . . . for purposes of the Department potentially adopting, in a new ROD, a different alternative from the 2020 IAP/EIS," and to provide the status of its evaluation within 120 days. ECF No. 34-1 at 3.

56. Based on this memo, Defendants requested an additional stay in this case, ECF No. 34, which the Court granted, ECF No. 39.

57. Following several extensions of the stay in this case, ECF Nos. 41, 46, & 49, and a January 7, 2022, update on BLM's progress in evaluating the 2020 decision, ECF No. 43-1, on April 25, 2022, BLM issued a new record of decision (2022 decision) adopting Alternative A, the No Action Alternative, from the 2020 EIS.

58. The 2022 decision replaced BLM's 2020 decision.

59. As a result of the 2022 decision, most provisions of the 2013 Plan are again applicable in the Reserve, including that approximately 11.8 million acres (52 percent) of the Reserve is available for oil and gas leasing.

60. While the 2022 decision reduced the area open to oil and gas leasing to

those areas open under the 2013 plan, it adopts a plan that could allow lease sales to occur on millions of acres within the Reserve with no further NEPA analysis.

61.     The determination of NEPA adequacy BLM issued in support of the 2022 decision states, explicitly that "the new ROD would authorize lease sales."

62.     Neither the 2022 decision nor the determination of NEPA adequacy limited or repudiated the statement in the 2020 EIS that: "This IAP/EIS is intended to fulfill NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter."

63.     On September 20, 2022, BLM published an errata sheet to the 2020 EIS deleting the language in the 2020 EIS representing that the EIS would fulfill NEPA requirements for lease sales through at least December 2039 and adding the statement that "[t]his programmatic IAP/EIS is not intended to, by itself and without further NEPA analysis, fulfill NEPA requirements for future lease sales."

64.     The errata sheet reaffirms that the 2020 EIS's impact analysis assumes that all lands the ROD determines to be available for leasing would be offered in each lease sale.  However, the errata sheet also states that BLM may use a phased approach, as it has done in the past: "the first sale, and any subsequent sale, might offer only a portion of the lands identified in the ROD as available, making possible a phased approach to leasing and development."

65.     The defendants and plaintiffs in the related case, *Northern Alaska Environmental Center, et al. v. Haaland, et al.*, Case No. 3:20-cv-00207-SLG, settled that

case on the basis of the errata sheet.

66.    The errata sheet does not eliminate assertions in the 2020 EIS or the 2022 determination of NEPA adequacy that the record of decision "would authorize lease sales."  These statements create ambiguity regarding whether the EIS was intended to fulfill NEPA requirements for future lease sales.

67.    The errata sheet also does not preclude BLM from relying on the 2020 EIS as the NEPA analysis for a future lease sale decision.

68.    Nor does the errata sheet preclude BLM from reversing its position and revising the 2020 EIS again to assert that it is intended to fulfill NEPA requirements for future lease sales.

69.    BLM could therefore attempt to rely on the 2020 EIS as the sole NEPA analysis for a future lease sale decision or could reverse its position that the 2020 EIS is not intended to fulfill NEPA requirements for future lease sales.

70.    It could then argue that section 6506a(n)(1) bars judicial review of the adequacy of the EIS for the lease sale.

71.    Because this possibility exists, Plaintiffs are compelled by section 6506a(n)(1) to pursue their claims that the 2020 EIS fails to satisfy NEPA for future lease sales at this time.

## CLAIMS FOR RELIEF

## COUNT I

72.    Plaintiffs incorporate by reference all of the preceding paragraphs.

73.     NEPA requires agencies to study a reasonable range of alternatives to their proposed actions.  42 U.S.C. § 4332(2)(C)(iii), (E); *see also* 40 C.F.R. § 1502.14.  An agency's consideration of alternatives serves the twin purposes of fostering informed decisionmaking and informed public participation.  The existence of reasonable but unexamined alternatives renders an EIS inadequate.

74.     NEPA applies whenever an agency makes an irretrievable commitment of resources, including when an agency sells leases that do not retain for the agency a right to prevent all surface disturbing activity.

75.     The 2020 EIS states that its purpose is to revise the 2013 Plan.  The 2020 EIS considered and evaluated the environmental impacts of five programmatic land management alternatives with different levels of land opened to leasing and new infrastructure.

76.     The 2020 EIS originally purported to fulfill NEPA requirements for leases sales conducted at least through December 2039 and potentially thereafter.

77.     Although BLM issued an errata sheet stating that the 2020 EIS is not intended to fulfill NEPA requirements for future lease sales, the errata sheet does not preclude BLM from attempting to rely on the 2020 EIS as the sole NEPA analysis for future lease sales or from reversing its position and again asserting that the 2020 EIS is intended to fulfill NEPA requirements for future lease sales and arguing that section 6506a(n)(1) forecloses judicial review of the EIS.

78.     Agencies may make site-specific decisions in a programmatic document.

However, they must undertake the site-specific analysis required by NEPA, including the consideration of reasonable alternatives. A range of alternatives that may be adequate at the programmatic level may be inadequate at the site-specific level, when the agency has discretion over whether to offer a tract for leasing.

79. The 2020 EIS does not analyze different leasing alternatives and does not state how BLM will decide whether, when, or where to offer tracts for sale.

80. Without adequate analysis of leasing alternatives or a binding requirement for BLM to engage in adequate NEPA analysis before authorizing any future lease sales, the 2020 EIS and 2022 decision could allow future leasing decisions to evade the level of analysis required by NEPA.

81. The failure of Defendants Interior, BLM, Secretary Haaland, Director Stone-Manning, and Director Cohn to consider a reasonable range of leasing alternatives and the impacts of those alternatives violates NEPA, 42 U.S.C. § 4332(2)(e)(iii), (E), 40 C.F.R. § 1502.14, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706.

## COUNT II

82. Plaintiffs incorporate by reference all of the preceding paragraphs.

83. NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The agency must take a hard look at the environmental consequences of a proposed action, including by disclosing and analyzing the significance of all direct, indirect, and cumulative environmental impacts of each

alternative.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8.  The agency's analysis must include accurate scientific analysis, expert agency comments, and public scrutiny.  40 C.F.R. § 1500.1(b).  NEPA requires that an EIS engage in reasonable forecasting.

84.    When an agency considers a decision that will result in greenhouse gas emissions, NEPA requires the agency to analyze and disclose the effects of these emissions, including emissions from fossil fuels that will be burned because they will be produced or delivered to market as a result of the agency's decision.  An agency must also provide adequate context for its emission estimates so that it can understand the significance of the project's emissions.  Comparison to state and national emissions totals is not a sufficient measure of significance.

85.    The 2020 EIS lacks the analysis of greenhouse gas emissions required by NEPA for the purpose of evaluating future lease sales.

86.    The 2020 EIS evaluates emissions for the entire integrated activity plan over the course of 70 years.  It fails to include any estimate or analysis of emissions from individual lease sales.

87.    BLM's analysis of greenhouse emissions in the 2020 EIS is inadequate in a number of other respects for the purpose of evaluating the impacts of individual lease sales.

88.    The 2020 EIS does not consider or explain the incremental impact of each alternative's projected emissions in light of past, present, and reasonably foreseeable actions.  Instead, the 2020 EIS downplays the importance of climate change and fails to

consider the urgent need to rapidly reduce greenhouse gas emissions globally. And it arbitrarily dismisses the impacts of emissions under the plan as "difficult to quantify since [the emissions] are a small fraction of annual U.S. and global GHG emissions," even though scientifically accepted methods for analysis are available. The 2020 EIS's reasons for rejecting these methods are arbitrary.

89. The 2020 EIS arbitrarily assumes that national and global fossil fuel use and emissions will remain constant over the next 70 years. In doing so, BLM fails to consider how the incremental impact of emissions from activities in the Reserve will change over time. Emissions and inventory are not stagnant over time and as annual global emissions and the background concentration of greenhouse gasses in the atmosphere change, the significance of the emissions from activities in the Reserve will change as well.

90. The 2020 EIS's discussion of emissions as a percentage of U.S emissions and global inventory is also misleading and arbitrary. Comparing emissions from a single action against national or global total emissions predestines that the emissions will appear relatively minor when in fact they may represent a significant contribution to climate change.

91. By failing to include any estimate or analysis of emissions resulting from individual lease sales, and by failing to completely and accurately analyze the direct, indirect, and cumulative impacts of greenhouse gas emissions from lease sales in the program areas, despite scientifically accepted methods being available, Defendants the

Department of the Interior, BLM, Secretary Haaland, Director Stone-Manning, and Director Cohn have violated NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1502.9(c), 1502.14, 1502.22, and the APA, 5 U.S.C. §§ 702, 706.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that the Court:

A.     Declare that Defendants have violated NEPA and the APA and further declare that the 2020 EIS fails to fulfill the requirements of NEPA for the purpose of authorizing lease sales in the Reserve;

B.     Vacate the 2020 EIS as applied to future lease sales;

C.     Vacate in part Defendants' 2022 Record of Decision only to the extent the decision authorizes future lease sales without additional NEPA analysis; and

D.      Grant such other relief as the Court considers just and proper, including Plaintiffs' costs of this action and reasonable attorneys' fees.

Respectfully submitted this 28th day of November, 2022.

*s/ Jeremy Lieb*
Jeremy C. Lieb (Alaska Bar No. 1810088)
Ian Dooley (Alaska Bar No. 2006059)
Erik Grafe (Alaska Bar No. 0804010)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
