Jeremy C. Lieb
Ian S. Dooley
Erik Grafe
EARTHJUSTICE
310 K Street Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org
E: idooley@earthjustice.org
E: egrafe@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity and Friends of the Earth*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and FRIENDS OF THE EARTH, <br><br> *Plaintiffs,* <br><br> v. <br><br> DOUG BURGUM, in his official capacity as Secretary of the Interior; BILL GROFFY, in his official capacity as Acting Director of Bureau of Land Management; KEVIN PENDERGAST, in his official capacity as Alaska State Director for Bureau of Land Management; SARA BOARIO, in her official capacity as Regional Director for the United States Fish and Wildlife Service; DREW CANE, in his official capacity as Deputy Assistant Regional Director for United States Fish and Wildlife Service; UNITED STATES DEPARTMENT OF THE INTERIOR; BUREAU OF LAND MANAGEMENT; and UNITED STATES FISH AND WILDLIFE SERVICE, <br><br> *Defendants,* <br> and <br><br> STATE OF ALASKA, <br><br> *Intervenor-Defendant.* | Case No. 3:20-cv-00206-SLG |

## THIRD AMENDED AND SUPPLEMENTAL COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF
### (U.S. Const. art. IV, § 3, cl. 2; 42 U.S.C. § 4332; 5 U.S.C. §§ 701-06;
### 42 U.S.C. §§ 6504, 6506a; 16 U.S.C. § 1536)

# INTRODUCTION

1.      This action arises from the Bureau of Land Management's ("BLM")

sequential revisions of its Integrated Activity Plans ("IAP") for the National Petroleum

Reserve-Alaska ("Reserve") in 2020, 2022, and 2025, and BLM's lease sale scheduled

for March 18, 2026, under the 2025 IAP.  The 2025 IAP opens 18.7 million acres, more

than 82 percent of the Reserve, to oil and gas leasing, exploration, and development,

including millions of acres in the most fragile and ecologically and culturally important

parts of the Reserve, which have long been protected.  It also removes lands from the

Teshekpuk Lake Special Area and eliminates the Colville River Special Area, which

were designated to provide maximum protection for the areas' significant resource values

in accordance with the Naval Petroleum Reserves Production Act ("Reserves Act").

BLM has now scheduled a lease sale ("2026 lease sale") offering more than 600 tracts

covering approximately 5.5 million acres, including in many of these most sensitive,

previously protected areas.  For decades, and across previous presidential

administrations, much of this land has been protected from leasing and development.

BLM has now broken with this precedent and arbitrarily taken actions to open and lease

long-protected lands without legal authority and in reliance on a 2020 final environmental

impact statement ("EIS") and 2025 environmental assessment ("EA") that fail to comply

with the agency's obligations under the National Environmental Policy Act ("NEPA").

The United States Fish and Wildlife Service ("Service") also issued a biological opinion

for the 2025 IAP that does not meet the legal obligations of the Service under the

*Center for Biological Diversity et al. v. Burgum et al.,*
Case No. 3:20-cv-00206-SLG                                                    2

Endangered Species Act ("ESA").

2.     The 23-million-acre Reserve is ecologically rich and sustains a diversity of wildlife that has supported cultural traditions and ways of life of Alaska Native peoples for thousands of years.  The lands the 2025 IAP targets for increased industrial oil and gas activities are recognized as a globally important ecological resource, home to a diversity of species, including bears, muskoxen, caribou, and millions of migratory birds. The lakes and lagoons of the Reserve, including in particular the Teshekpuk Lake region, are the birthplace of millions of birds that fly to all 50 states and five continents.  Under the 2025 IAP, Teshekpuk Lake and areas surrounding many of the Reserve's other lakes and lagoons will be opened for leasing to oil companies for the first time.  The Reserve provides calving, insect relief, and migration areas for the Western Arctic and Teshekpuk Caribou Herds, which provide vital subsistence resources for more than 40 communities in northern and western Alaska.  Coastal areas of the Reserve also provide designated critical habitat for threatened polar bears and important habitat for other marine mammals, including Pacific walruses and ice seals.

3.     The 2025 IAP opens millions of acres to oil and gas leasing, many of which have been protected until now from leasing and associated activities because of their world-class value to wildlife and subsistence.  BLM projects that oil production, surface disturbance, gravel and water use, and greenhouse gas emissions could roughly double compared to the 2013 IAP.  The projected proliferation of oil and gas activities under the 2025 IAP will dramatically increase harmful impacts to the Reserve's ecosystems and the

climate, significantly affecting the people and wildlife in the Reserve and beyond.

4.     The 2025 IAP unlawfully removes lands from the Teshekpuk Lake Special Area and eliminates the Colville River Special Area.  The Reserves Act provides the Secretary of the Interior only the authority to designate special areas for maximum protection of identified significant resource values.  Congress has not authorized the Secretary to remove lands from or eliminate special areas, especially where those lands still contain the significant resource values that supported their designation.  BLM's attempt to do so violates the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2, the Reserves Act, 42 U.S.C. § 6504(a), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

5.     BLM's 2020 EIS and 2025 EA do not analyze or describe the full scale of impacts that will result from the 2025 IAP, nor do they assess alternatives to or impacts from holding any individual lease sale in the Reserve over the next two decades, despite purporting to authorize all such sales.  Because of these failures, BLM has not considered reasonable alternatives to the 2026 lease sale or any future lease sale decision, or the differential impacts of such alternatives, in violation of NEPA, 42 U.S.C. § 4332.  BLM also failed to consider significant new information and circumstances relevant to the 2025 IAP and 2026 lease sale, including information concerning oil development potential, impacts to caribou, and impacts from winter seismic activities, in violation of NEPA, *id.*

6.     BLM's decision to offer lands for lease within the Teshekpuk Lake Special Area that had previously been closed to leasing, including lands that have never been

open to oil and gas leasing, fails to provide a reasoned explanation for disregarding and contradicting the agency's extensive previous findings that closing these lands to leasing was necessary to protect significant resource values, in violation of the Reserves Act, 42 U.S.C. § 6504(a), and the APA, 5 U.S.C. § 706.  BLM's decision to offer lands for lease within the Teshekpuk Lake Special Area and the unlawfully eliminated Colville River Special Area also fails to demonstrate how offering previously closed lands for lease in these areas is consistent with the agency's obligation to provide maximum protection to the areas' significant resource values, in violation of the Reserves Act, 42 U.S.C. § 6504(a).

7.     The Service's biological opinion acknowledges that polar bear populations are declining and will continue to decline in part because of loss of sea ice habitat, and that the number of bears denning on land will increase, thereby increasing the chance of harm from onshore oil and gas activity.  Yet the Service disregards these trends in concluding that the IAP is not likely to jeopardize polar bears or adversely modify their critical habitat.  The Service's jeopardy analysis also relies on non-binding mitigation measures, including the assumption that companies conducting exploration will use the best available den surveying techniques.  Because of these failures, the Service could not and did not accurately analyze how the 2025 IAP would likely affect polar bears and their critical habitat, in violation of the ESA, 16 U.S.C. § 1536.  Additionally, even though the biological opinion concludes that 102 maternal dens will be disturbed under the IAP, leading to the death of 42 cubs and the reduced survival probability of another 176 cubs,

the Service issued a biological opinion that fails to include an incidental take statement for the take the agency estimates will occur under the IAP, in violation of the ESA, *id.*

8.    The Reserves Act provides that "[a]ny action seeking judicial review of the adequacy of any program or site-specific environmental impact statement . . . concerning oil and gas leasing in the [Reserve] shall be barred unless brought in the appropriate District Court within 60 days after notice of the availability of such statement is published in the Federal Register."  42 U.S.C. § 6506a(n)(1).

9.    Plaintiffs do not concede that this requirement applies when an agency fails to publish a record of decision ("ROD") within 60 days after publishing a final EIS. Plaintiffs nevertheless filed their first complaint on August 24, 2020, within 60 days after June 26, 2020, the date notice of availability of the 2020 EIS was published in the Federal Register, 85 Fed. Reg. 38388 (June 26, 2020), to ensure all of Plaintiffs' claims were preserved.

10.    Plaintiffs have since twice amended their complaint in response to BLM's 2020 IAP ROD, issued on December 31, 2020, and its 2022 IAP ROD, issued on April 25, 2022, each of which relied on BLM's 2020 EIS.  Docs. 24, 63.  BLM released its 2025 IAP on December 22, 2025.  This third amended and supplemental complaint challenges that decision and BLM's lease sale noticed on February 11, 2026, and scheduled for March 18, 2026.

11.    Plaintiffs ask this Court to enforce the statutory obligations and commands protecting the Reserve's environment that the Defendants have ignored, and set aside the

unlawful 2020 EIS, 2020 IAP, 2025 IAP, 2026 lease sale decision, and any actions taken in reliance on them.  Plaintiffs also ask the Court to set aside the Service's unlawful 2025 biological opinion and any actions taken in reliance upon it.

## JURISDICTION & VENUE

12.　　The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §§ 2201-02.  Judicial review and vacatur of illegal agency actions is available under the APA, 5 U.S.C. §§ 701-06.

13.　　Venue is appropriate under 28 U.S.C. § 1391(e) because the Reserve is located within this District and decisions were made by officials located within the District.

## PLAINTIFFS

14.　　Plaintiff Center for Biological Diversity ("Center") is a national, non-profit organization, with offices across the country and in La Paz, Mexico.  The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health.  The Center has more than 101,000 members.  The Center is actively involved in species and habitat protection issues throughout the United States, including protection of the Arctic and wildlife threatened by oil and gas leasing, exploration, and development.  As part of these efforts, the Center works to protect Arctic wildlife that lives in and near the Reserve from the numerous harms inherent in oil and gas leasing, exploration, and development, including noise pollution, habitat destruction, oil spills, and greenhouse gas pollution that exacerbates the

climate crisis.

15.     Plaintiff Friends of the Earth ("FoE") is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation.  FoE is a membership organization consisting of nearly 140,000 members, including more than 300 members who live in Alaska, and more than 4.7 million activists nationwide.  FoE is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide.  FoE's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world.  FoE utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals.  FoE and its members will be harmed by the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including in the Reserve, have on the climate and people, fish, birds, and other species that depend on this region.  Therefore, on behalf of its members and activists, FoE actively engages in advocacy to influence U.S. energy and environmental policies affecting Alaska's Arctic.

16.     Members of plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve, including areas that are affected by the 2025 IAP and 2026 lease sale, such as the Teshekpuk Lake and Colville River Special Areas.  Plaintiffs' members use and enjoy these areas for various purposes, including subsistence activities, recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment.  Members of plaintiff groups also use or otherwise enjoy migratory wildlife that depend on the Reserve, including caribou, polar bears, and birds.  Opening

more of the Reserve's wildlife habitat and special places to fossil fuel leasing and offering those lands for lease will lead to exploration and other oil and gas related activities in these areas, will directly and irreparably injure these interests.

17. Plaintiffs have submitted comments to BLM on the agency's draft 2020 EIS, draft 2025 EA, and its 2025 call for lease sale nominations, and Plaintiffs have provided substantial additional information to BLM concerning its management of the Reserve outside of official public comment periods. Each of the plaintiff groups monitors the use of public lands in the Reserve and compliance with the laws respecting these lands, educates its members and the public about the management of these lands, and advocates policies and practices that protect the natural and cultural values and sustainable resources of these lands. It is impossible for the plaintiff groups to fully achieve these organizational purposes without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the Plaintiffs will be directly and irreparably injured by Defendants' violations of law as described in this complaint.

**DEFENDANTS**

18. Defendant Doug Burgum is the Secretary of the United States Department of the Interior. He is sued in his official capacity.

19. Defendant Bill Groffy is the official who is exercising the authority of the Director of BLM. Mr. Groffy is responsible for the supervision and management of all decisions, operations, and activities of BLM. He is sued in his official capacity.

20.     Defendant Kevin Pendergast is the Alaska State Director of BLM.  He is sued in his official capacity.

21.     Defendant Sara Boario is the Regional Director for the Service.  She is sued in her official capacity.

22.     Defendant Drew Cane is the Deputy Assistant Regional Director for the Service.  He is sued in his official capacity.

23.     Defendant United States Department of the Interior is an agency of the United States responsible for oversight of BLM.

24.     Defendant BLM is an agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve.

25.     Defendant Service is an agency of the United States Department of the Interior entrusted with conservation and protection of fish, wildlife, plants, and their habitats, including those in the Reserve.

## STATEMENT OF FACTS

**I.      The Reserve**

26.     Originally set aside in 1923, the 23-million-acre Reserve is an extraordinary and ecologically important landscape of lakes, ponds, rivers, floodplains, other wetlands, upland areas, and sensitive coastal resources.  It is home to a diversity of species, including polar bears, brown bears, muskoxen, caribou, moose, and millions of migratory birds, including waterbirds and shorebirds, among many other species.  This landscape and its wildlife are central to the livelihoods and traditional practices of Iñupiat

people living in the region.

27.     In 1976, Congress passed the Reserves Act, which transferred jurisdiction over the Reserve from the Navy to the Secretary of the Interior, in recognition of the area's significant ecological value and the need to protect it.  Pub. L. No. 94-258, tit. I, §§ 102-03, 90 Stat. 303, 303-04 (codified at 42 U.S.C. §§ 6502-03).

28.     At that time, the Reserve remained "almost completely undeveloped." 89 Fed. Reg. 38712, 38715 (May 7, 2024) (quoting H.R. REP. NO. 94-156, at 3 (1975)). Given the Reserve's extraordinary ecological, cultural, and scenic values, Congress recognized the need to manage it "so that any activities which are or might be detrimental to such values will be carefully controlled."  H.R. REP. NO. 94-942, at 20 (1976) (Conf. Rep.).

29.     In this context, the Reserves Act created a unique management structure for the Reserve, withdrawing the Reserve from entry and disposition under other public land laws.  42 U.S.C. § 6502.

30.     As originally enacted, the Reserves Act provided for a federal exploration program, but it prohibited private leasing until authorized by an act of Congress.  Pub. L. No. 94-258, tit. I, § 104(a), 90 Stat. 303, 304.

31.     In 1980, Congress amended the Reserves Act to remove this prohibition and authorized the Secretary of the Interior to prescribe an "expeditious program of competitive leasing" within the Reserve.  Pub. L. No. 96-514, tit. I, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C. § 6506a(a)).  But in doing so, Congress required BLM to

protect the Reserve's exceptional ecological and cultural values from significant adverse effects. *Id.* (codified at 42 U.S.C. § 6506a(b)).

32. Because of the world-class wildlife and cultural values of the Reserve, the Reserves Act requires the Secretary to ensure that any oil and gas leasing, exploration, and development it authorizes is consistent with its obligations to protect and conserve other resources and uses in the Reserve. 42 U.S.C. §§ 6504(a), 6506a(b).

33. The Reserves Act requires the Secretary to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]." 42 U.S.C. § 6506a(b).

34. The Reserves Act further requires that activities within designated areas "containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve." 42 U.S.C. § 6504(a).

35. The Reserves Act designates the Teshekpuk Lake (located in the northeastern corner of the Reserve) and Utukok River (located in the southwestern corner) areas as requiring maximum protection, and it authorizes the Secretary to designate additional areas meeting the statutory criteria. 42 U.S.C. § 6504(a).

36. As BLM's applicable regulations recognize, these "special areas" within which "[m]aximum protection measures will be taken" include "the Utukok River

Uplands, Colville River, and Teshekpuk Lake special areas, and any other special areas identified by the Secretary as having significant subsistence, recreational, fish and wildlife, or historical or scenic value." 43 C.F.R. § 2361.10(b).

37. Under the Reserves Act, BLM may manage the lands, wildlife, and other values and uses of the Reserve, including any oil and gas activities, through formal rulemaking and administrative process. While the Reserves Act does not specify a particular form of administrative process for the Reserve's management, in recent decades BLM has followed a multi-step administrative process to manage the lands, wildlife, and other values and uses of the Reserve, including any oil and gas activities in the Reserve. BLM first promulgates IAPs which are programmatic management plans that zone areas of the Reserve for various purposes, set aside lands for protection of surface values, and impose limits on the manner in which oil and gas activities may take place in those areas where oil and gas leasing is permitted. It may next hold lease sales of specified tracts, which vary from sale to sale, in areas that the IAPs have designated as open for leasing. For areas where leases are sold and issued, BLM regulates any activities by lessees, which may include reviewing and determining whether to approve, condition, restrict, or deny exploration plans when such plans are submitted by lessees, and, if lessees seek to develop oil or gas resources, reviewing and determining whether to approve, condition, restrict, or deny any plans for developing and producing these fossil fuels.

## II.   The 1977 rules and the first special areas

38.   In 1977, the Department of the Interior promulgated regulations to implement the Reserves Act.  *See* 42 Fed. Reg. 28720 (June 3, 1977).

39.   The regulations define "special areas" to be those "areas within the [R]eserve identified by the Secretary of the Interior as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve."  43 C.F.R. § 2361.0-5(f) (1977); 43 C.F.R. § 2361.5(f) (2025).

40.   The regulations specifically recognize Teshekpuk Lake, Utukok River Uplands, and Colville River as "special areas" possessing significant values requiring maximum protection.  43 C.F.R. § 2361.1(c) (1977); 43 C.F.R. § 2361.10(b) (2025); 42 Fed. Reg. at 28722.

41.   In June 1977, the Department of the Interior designated the Teshekpuk Lake, Utukok River Uplands, and Colville River Special Areas, finding that maximum protection was necessary for important habitat for caribou, migratory birds and waterbirds, and Arctic peregrine falcon.  *See* 42 Fed. Reg. 28723, 28723 (June 3, 1977).

42.   Teshekpuk Lake is the largest lake on the North Slope and is located between Utqiaġvik and Nuiqsut.  The lands around and northeast of the lake are critical habitat for a wide range of wildlife.  Caribou from the Teshekpuk Caribou Herd return every year to the lands near Teshekpuk Lake and adjoining coastal areas to give birth to

their calves. These lands are also essential molting habitat for geese.

43. Lands in the Teshekpuk Lake Special Area provide important habitat for many species of shorebirds and waterbirds including Spectacled and Steller's Eiders, which are both listed as threatened species under the ESA, as well as Yellow-billed Loons. The Teshekpuk Caribou Herd also uses these lands for calving and to seek relief from insect harassment during the summer. During most years since 1990, the majority of the Teshekpuk Caribou Herd has overwintered in the Reserve, including the area southeast of Teshekpuk Lake. The Teshekpuk Caribou Herd is unique amongst Arctic caribou because many of its members use the Reserve year-round.

44. The Teshekpuk Caribou Herd and other resources in and around the Teshekpuk Lake Special Area are especially important to the primarily Iñupiat community of Nuiqsut. Community members depend on the fish and wildlife of the Reserve, especially in areas within and near the Teshekpuk Lake Special Area, for essential traditional subsistence hunting, trapping, and fishing activities. These practices—and the traditions of sharing and passing these practices to future generations—are critical to the community's health, well-being, and cultural identity. Caribou hunting in the area is especially important.

45. For these reasons, at least some lands around Teshekpuk Lake have been closed or deferred from leasing in every BLM planning decision covering this portion of the Reserve since 1983.

46. The Utukok River Uplands Special Area is home to the calving and

summer migration grounds for the Western Arctic Herd of caribou. It is an important

subsistence use area and provides excellent opportunities for recreation and study of

natural flora and fauna. Although the Western Arctic Herd does not remain in the

Utukok River Uplands year-round, calving success plays an important role in maintaining

the herd's population throughout the Arctic. BLM estimates "that at least 43 rural

communities use the Western Arctic Herd and for some it is their primary terrestrial meat

source."

47.     The Colville River Special Area contains important habitat for numerous

species, including the Arctic Peregrine Falcon, and provides crucial subsistence resources

for North Slope residents. The Colville River is the largest of Alaska's rivers that flow to

the Arctic Ocean. The Colville River and its wetlands provide the most important raptor

nesting habitat on the North Slope and are recognized as one of the most significant

regional habitats for raptors in North America. In addition to essential subsistence

resources, the region provides a year-round travel corridor for North Slope residents,

including for hunting and trapping. Its watershed provides habitat for moose, fish,

furbearers, and other species. The Colville River Special Area is also known for its

recreational opportunities and world-class paleontological deposits.

**III.     The 1998 and 2004 IAPs**

48.     In 1998, the Department of the Interior implemented the first IAP for the

northeast region of the Reserve.

49.     The 1998 IAP provided surface protections for the Teshekpuk Lake and

Colville River Special Areas.  It also expanded the Colville River Special Area to include large portions of the Kikiakrorak and Kogosukruk rivers, which increased the special area boundary to cover 2.44 million acres, and it expanded the Teshekpuk Lake Special Area to include the Pik Dunes.

50.    In 2004, the Department of the Interior adopted an IAP for the northwest region of the Reserve.

51.    The 2004 IAP designated the Kasegaluk Lagoon Special Area, which provides important marine mammal habitat and other values.

## IV.    The 2013 IAP

52.    In 2013, the Department of the Interior issued its first comprehensive management plan covering the entire Reserve.  This 2013 IAP designated approximately 52 percent (11.8 million acres) of the Reserve as available for oil and gas leasing, subject to requirements to protect other values, and prohibited oil and gas leasing on approximately 11 million acres particularly valuable for wildlife habitat and for other uses.  The 2013 IAP also prohibited new non-subsistence permanent infrastructure on approximately 8.4 million acres of the Reserve.

53.    The 2013 IAP expanded the Teshekpuk Lake Special Area by two million acres to include lands between Utqiaġvik and Nuiqsut to protect important bird and caribou habitat.  BLM also expanded the Utukok River Uplands Special Area to 7.1 million acres to further encompass important caribou calving and insect relief habitat.

54.    The 2013 IAP also broadened the purpose of the Colville River Special

Area finding that maximum protection was needed for all raptors in the area, not just Arctic Peregrine Falcons. It also designated the new Peard Bay Special Area to protect its important marine mammal habitat and its high use for staging and migration for shorebirds and waterbirds.

55.     In addition to being important habitat for birds, caribou, and marine mammals, the 2013 IAP recognized that the Reserve's coastal areas provide the sea ice and habitat conditions to support denning areas and other critical habitat for polar bears. Polar bears are listed as threatened species under the ESA and are also protected under the Marine Mammal Protection Act. 50 C.F.R § 17.40(q); 73 Fed. Reg. 28212 (May 15, 2008); 78 Fed. Reg. 11766 (Feb. 20, 2013). BLM recognized that climate change had caused negative effects to the Chukchi and Southern Beaufort Sea ("SBS") polar bear populations and that they could "be extirpated from much of their range in the next 40 to 75 years" due to sea ice loss. As sea-ice extent and duration decreases, polar bears are spending more time onshore, including increasingly coming on land to den and have their cubs. This trend is expected to continue, with inland areas of the Reserve becoming more critical to the bears.

56.     During the process leading up to BLM's adoption of the 2013 IAP, some commenters suggested eliminating or reducing the size of existing special areas. BLM found this inappropriate because "no information has come to the BLM's attention that would indicate that current Special Areas or portions of Special Areas do not meet the criteria set out in the [Reserves Act]—i.e., that they fail to contain "'significant

subsistence, recreational, fish and wildlife, or historical or scenic value.'" BLM explained the purpose of special areas is to "indicate to managers and the public the importance of certain lands and the need to consider carefully the appropriate protection of surface resources consistent with oil and gas activities."

57.     Many of the lands the 2013 IAP closed to leasing and infrastructure were in the Utukok River Uplands and Teshekpuk Lake Special Areas.

58.     To provide strong protection for the Western Arctic Herd, which is important for subsistence in northwestern Alaska, the 2013 IAP prohibited leasing and most new permanent infrastructure in the majority of the Utukok River Uplands Special Area.

59.     Although BLM recognized the likely presence of oil reserves in the Teshekpuk Lake Special Area, the 2013 IAP kept most of the Teshekpuk Lake Special Area closed to leasing to protect important habitat for caribou calving and insect relief and a variety of waterbirds and shorebirds.  In particular, it closed Teshekpuk Lake itself and the lands nearest to the lake to leasing and new infrastructure because of the critical importance of these areas for caribou calving and geese molting, noting that "some of these lands have been made unavailable or deferred from leasing in every planning decision made by BLM for this part of [the Reserve] since 1983."  The 2013 IAP left open for leasing only the lands in the Teshekpuk Lake Special Area's easternmost portion located close to existing leases.

60.     The 2013 IAP also made Peard Bay, Kasegaluk Lagoon, Elson Lagoon,

Dease Inlet, Admiralty Bay, and other smaller inlets along the coast north and east of Teshekpuk Lake unavailable for leasing because of the risks of oil spills and other disturbances that exploration and development would present to the resource values in these areas.



61. By closing certain parts of the Reserve to development, BLM protected these lands in multiple ways. BLM prevented ground- and habitat-disrupting activity from seismic and drilling exploration, and from the construction of oil and gas infrastructure, including roads, pipelines, landing strips, and drilling pads.

62. From 2013 to 2019, BLM held annual lease sales within the Reserve. In each of these sales, the agency offered different numbers and configurations of tracts

within the areas classified as open to leasing.

## V.    The 2020 EIS

63.    In 2017, after the election of President Trump, the Secretary of the Interior signed Secretarial Order 3352, which directed BLM to review and develop a revised IAP.

64.    BLM began a NEPA scoping process and, on November 21, 2019, released a draft EIS for the revised IAP.

65.    Groups submitted comments in the scoping process and on the draft EIS urging BLM not to open additional lands to oil and gas leasing and development and to provide the strongest possible environmental protections for special areas and other lands within the Reserve.  These comments included extensive documentation of the Reserve's exceptional environmental and cultural values and the harm that would result from continued and expanded oil and gas exploration and development.

66.    On June 26, 2020, BLM published the 2020 EIS for the revised IAP.  The 2020 EIS states that its purpose is to determine the appropriate management of BLM-managed lands in the Reserve.  Additionally, the 2020 EIS stated that it "fulfill[s] NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter."

67.    The 2020 EIS considers five programmatic alternatives that classify land as either opened or closed to leasing.  Each of the action alternatives the EIS considered would allow continued expansion of oil and gas leasing in the Reserve.  Alternative A, the no-action alternative, would leave the 2013 IAP in place; Alternative B would open

48 percent (10.9 million acres) of the Reserve to oil and gas leasing; Alternative C would open 76 percent (17.3 million acres); Alternative D would open 82 percent (18.6 million acres); and BLM's preferred Alternative E would open 82 percent (18.7 million acres).

68.     All action alternatives eliminate the Colville River Special Area and the southern portion of the Teshekpuk Lake Special Area.

69.     The 2020 EIS states that "[t]he decisions evaluated in this IAP/EIS and its ROD would authorize lease sales," and prior to errata issued in 2022, it stated that it was "intended to fulfill NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter."

70.     Although the 2020 EIS purported to fulfill all NEPA requirements for lease sales held through 2039, it does not identify how BLM will decide what lands to lease and when.

71.     The 2020 EIS states that its analysis assumes all tracts made available under each programmatic alternative will be offered during each lease sale.  The EIS, however, acknowledges BLM may use a phased approach and offer only a portion of available lands.

72.     The 2020 EIS does not consider lease sale alternatives (*i.e.*, various configurations of lease sales within areas open for leasing in various years based on different criteria), nor does it attempt to analyze or compare the impacts of different lease sale alternatives.  It considers only alternatives for the planning level decision about which areas will be zoned for future leasing and oil exploration and development

activities.

73. The alternatives considered, and associated impacts analyses for each programmatic action alternative, are on a massive scale, covering roughly 48 percent (Alternative B), 76 percent (Alternative C), and 82 percent (Alternatives D and E) of the Reserve, rather than at the scale of impacts associated with potential future lease sales covering specific areas of the Reserve.

74. The 2020 EIS estimates that the alternatives considered could each lead to massive greenhouse gas emissions from the extraction and burning of oil under high production scenarios—between approximately 1.3 billion barrels of oil under Alternative A and 2.6 billion barrels of oil under Alternative E, causing between 466 million and nearly one billion tons of greenhouse gas emissions, respectively, over the IAP's lifetime.

75. The 2020 EIS evaluates environmental impacts, including to the climate, to subsistence, and to wildlife, such as caribou, waterbirds, shorebirds, and raptors, based on "reasonably foreseeable development scenario[s]" across the entire Reserve and over the course of 70 years. This analysis provides little additional context beyond the obvious point that the alternatives that open more land to leasing and infrastructure could lead to more development and more environmental impacts.

76. Although BLM had not issued a ROD, to ensure compliance with the Reserves Act's 60-day statute of limitations for claims challenging the adequacy of an EIS concerning oil and gas leasing, Plaintiffs filed this lawsuit on August 24, 2020, within 60 days after June 26, 2020, the date notice of availability of the final 2020 EIS

was published in the Federal Register, 85 Fed. Reg. 38388 (June 26, 2020). Doc. 1.

77. This Court stayed all proceedings in this case until the Defendants issued a ROD. Doc. 10.

## VI. The 2020 and 2022 IAPs

78. On December 31, 2020, the Secretary of the Interior signed the ROD for the 2020 IAP, adopting Alternative E with only minor modifications.

79. The 2020 IAP opened approximately 6.8 million more acres to oil and gas leasing in the Reserve. The decision also allowed most types of new infrastructure in over 13 million acres, with an additional five million acres open to certain types of infrastructure such as essential pipeline crossings and roads.

80. The 2020 IAP removed lands from the Teshekpuk Lake Special Area and eliminated the Colville River Special Area.

81. The 2020 IAP was the first time in the history of the Reserve that the Department of the Interior purported to remove lands from or eliminated previously designated special areas.

82. Neither the 2020 IAP decision nor the 2020 EIS acknowledge that removing lands from special areas is contrary to previous findings that special area status was necessary because the lands contained significant resource values or provides a reasoned explanation for disregarding those previous findings.

83. Similarly, neither the 2020 IAP decision nor the 2020 EIS acknowledge that opening millions of acres of previously protected lands to leasing is contrary to prior

agency findings that closing the lands to leasing was necessary to protect important values, including caribou, bird, and polar bear habitat and subsistence uses, or provide a reasoned explanation for disregarding those findings.

84.     On February 15, 2021, Plaintiffs filed their first amended complaint in this case challenging the 2020 IAP decision.  Doc. 24.

85.     On March 11, 2021, Defendants moved to stay this case while new officials within the Department of the Interior reviewed the 2020 IAP decision.  Doc. 27.

86.     The Court granted Defendants' motion.  Doc. 28.

87.     Following several extensions of the stay in this case, Docs. 30, 33, 41, 46, & 49, the Department of the Interior's issuance of a memorandum directing BLM to evaluate the 2020 EIS to potentially adopt a different alternative, Docs. 34 & 34-1, and a January 7, 2022, update on BLM's progress in evaluating the 2020 EIS, Doc. 43-1, on April 25, 2022, BLM issued a new ROD adopting Alternative A, the No Action Alternative, from the 2020 EIS ("2022 IAP").

88.     The 2022 IAP replaced the 2020 IAP, and reinstated most provisions of the 2013 IAP, including that approximately 11million acres (48 percent) of the Reserve were unavailable for oil and gas leasing "in order to protect and conserve important surface resources and uses in these areas . . . includ[ing] areas critical to sensitive bird populations and the Teshekpuk Lake and Western Arctic Caribou Herds . . . ."

89.     Under the 2022 IAP, special area boundaries returned to those promulgated under the 2013 IAP.  The ROD explains that the reinstated boundaries "generally

encompass prime calving and insect-relief habitat and waterbird and shorebird breeding, molting, staging, and migration habitat within the [Reserve]."

90.     The 2022 IAP again prohibited leasing and new infrastructure in "a sizeable area around Teshekpuk Lake which is of critical importance for nesting, breeding, and molting waterfowl and the Teshekpuk Caribou Herd."

91.     While the 2022 IAP reduced the area open to oil and gas leasing to those areas open under the 2013 IAP, it adopted a plan that could allow lease sales to occur on millions of acres within the Reserve with no further NEPA analysis.

92.     The determination of NEPA adequacy BLM issued in support of the 2022 IAP stated explicitly that "the new [IAP] ROD would authorize lease sales."

93.     Neither the 2022 IAP ROD nor the determination of NEPA adequacy limited or repudiated the statement in the 2020 EIS that: "This IAP/EIS is intended to fulfill NEPA requirements for lease sales conducted at least through December 2039 and potentially thereafter."

94.     On September 20, 2022, BLM published an errata sheet to the 2020 EIS deleting the language in the 2020 EIS representing that the EIS would fulfill NEPA requirements for lease sales through at least December 2039 and adding the statement that "[t]his programmatic IAP/EIS is not intended to, by itself and without further NEPA analysis, fulfill NEPA requirements for future lease sales."

95.     The errata sheet reaffirmed that the 2020 EIS's impact analysis assumes that all lands the ROD determines to be available for leasing would be offered in each

lease sale. However, the errata sheet also states that BLM may use a phased approach, as it has done in the past: "the first sale, and any subsequent sale, might offer only a portion of the lands identified in the ROD as available, making possible a phased approach to leasing and development."

96. The errata sheet did not eliminate assertions in the 2020 EIS or the 2022 determination of NEPA adequacy that the 2022 IAP "would authorize lease sales." These statements created ambiguity regarding whether the 2020 EIS was intended to fulfill NEPA requirements for future lease sales.

97. On November 28, 2022, Plaintiffs submitted their second amended complaint, challenging the 2020 EIS's alternatives and climate analysis. Doc. 63.

98. On January 27, 2023, Defendants moved to dismiss the matter, alleging that it was no longer ripe for review. Doc. 65.

99. In support of their motion to dismiss, Defendants acknowledged that "BLM now agrees" the "programmatic analysis of the [2020] EIS is not sufficient to support site-specific decisions to offer lease sales." Doc. 65 at 10.

100. On September 14, 2023, this Court denied Defendants' motion, concluding that because BLM could again seek to rely on 2020 EIS as the sole NEPA analysis for a future lease sale decision or could reverse its position that the 2020 EIS is not intended to fulfill NEPA requirements for future lease sales, Plaintiffs' claims are not moot and are ripe for review. Doc. 73.

101. Plaintiffs filed their opening summary judgment brief on December 13,

2024.  Doc. 106.

102.    On January 6, 2025, Defendants filed their response brief, which did not defend the adequacy of the 2020 EIS's alternatives or climate analysis.  Doc. 108.

103.    On June 18, 2025, Defendants moved to stay the ongoing proceedings, citing in part the then new administration's actions relating to the underlying dispute. Doc. 122 at 3-4.

104.    On June 30, 2025, this Court granted Defendants' unopposed motion to stay, denied without prejudice Plaintiffs' summary judgment motion, and granted leave to refile briefing once the stay has been lifted.  Doc. 127.

## VII.    The 2024 and 2025 rulemakings

105.    On May 7, 2024, BLM issued a new rule for the Management and Protection of the National Petroleum Reserve in Alaska ("2024 Rule").  89 Fed. Reg. 38712 (May 7, 2024).

106.    Among other regulations, the 2024 Rule codified the special areas and boundaries as delineated by previous Secretarial designations.  43 U.S.C. § 2361.40(d) (2024).  In doing so, the Rule recognized the "significant resource values as currently identified by Secretarial decisions designating or amending the Special Areas."  89 Fed. Reg. at 38736.  These special areas include the "Colville River Special Area, which has important habitat for raptor and other bird species, including the Arctic peregrine falcon; important habitat for moose; important habitat for fish; important subsistence activities; important recreational activities; world-class paleontological deposits; and significant

cultural resources;" and the "Teshekpuk Lake Special Area, which has important habitat for a large number of migratory and other waterbirds; important caribou habitat; important shorebird habitat; subsistence hunting and fishing activities; Pik Dunes; and overwintering habitat for fish." *Id.* at 38736-37.

107. The 2024 Rule also prohibited BLM from removing lands from Teshekpuk Lake and Utukok River Uplands Special Areas absent an act of Congress, and from other special areas unless it could be shown that "all of the significant resource values that support the designation are no longer present." 43 C.F.R. § 2361.30(c) (2024).

108. On June 3, 2025, under a new presidential administration, BLM published notice in the Federal Register, proposing to rescind the 2024 Rule and to reinstate the 1977 regulations. 90 Fed. Reg. 23507, 23509 (June 3, 2025).

109. On November 17, 2025, BLM published a final rule rescinding the 2024 Rule and reinstating the 1977 regulations "with limited technical changes, corrections, and clarifications." 90 Fed. Reg. 51470, 51475 (Nov. 17, 2025).

110. The new regulations became effective on December 17, 2025. 90 Fed. Reg. at 51470.

## VIII. The Reconciliation Act and Congressional Review Act resolution

111. On July 4, 2025, Congress passed a reconciliation act, which mandated five lease sales be held within the Reserve within 10 years. Pub. L. No. 119-21, § 50105(c)(1), 139 Stat. 72, 144 (2025) ("the Reconciliation Act").

112. The Reconciliation Act requires BLM to offer at least 4,000,000 acres in

each lease sale, and that the first lease sale be held by July 4, 2026.  Pub. L. No. 119-21, § 50105(c).

113.    The Reconciliation Act requires these lease sales be held "in the areas designated for oil and gas leasing as described" in the 2020 EIS and ROD.  Pub. L. No. 119-21, § 50105(b).

114.    The Reconciliation Act does not change Reserve special area boundaries.

115.    The Reconciliation Act does not eliminate BLM's obligation to comply with other applicable laws, including the Reserves Act, NEPA, the APA, and the ESA, when holding a lease sale.

116.    On December 5, 2025, the President signed a resolution under the Congressional Review Act disapproving the 2022 IAP.  Pub. L. No. 119-47, 139 Stat. 696 (2025).

117.    The resolution only served to disapprove the 2022 IAP.  It did not approve or endorse any previous or future IAP decision and it did not disapprove any prior IAP decision, including the 2013 or 2020 IAPs, nor did it address future lease sale decisions.

## IX.    The 2025 IAP

118.    Upon taking office, President Trump issued Executive Order 14153 which, among other directives, ordered the Secretary of the Interior to reinstate Secretarial Order 3352 and the 2020 IAP ROD selecting Alternative E.  90 Fed. Reg. 8347, 8349 (Jan. 29, 2025).  On February 3, 2025, the Secretary issued Secretarial Order 3422, directing the Assistant Secretary for Land and Minerals Management to submit plans to implement the

directives in Executive Order 14153, including reinstating the 2020 IAP, and reinstating Secretarial Order 3352.  Secretarial Order No. 3418, § 6 (Feb. 3, 2025).

119.    On April 18, 2025, Plaintiffs and other groups submitted comments to BLM describing numerous studies, reports, and other documents providing new information relevant to the 2020 IAP and its potential impacts.  This included information demonstrating that the 2020 EIS's estimates of oil production and exploration, including seismic exploration, underlying its development scenarios and impacts analysis are inaccurate and underestimate potential impacts over the 70-year timeframe of analysis.  It also included new information relevant to the status of caribou, shorebirds, Yellow-billed Loons, waterfowl, polar bears; the potential impacts of oil and gas exploration and development on those species in the Reserve; and the climate impacts of oil and gas development in the Reserve.

120.    On June 17, 2025, BLM issued the draft 2025 EA for a proposed action to select Alternative E from the 2020 EIS and reinstate the 2020 decision.

121.    Plaintiffs and other groups submitted comments on the draft 2025 EA, again urging BLM to maintain protections for the Reserve, and raising several additional concerns with the EA's analysis, including the agency's failure to adequately assess greenhouse gas emissions, to address other new information and circumstances since the 2020 ROD was issued, and to analyze and discuss lease sale alternatives.  The comments also explained how Alternative E is contrary to the environmental protection mandates of the Reserves Act.

122.    On December 22, 2025, BLM posted a final 2025 EA and its 2025 IAP decision to its ePlanning webpage, again selecting Alternative E to open approximately 18.6 of the Reserve's 22 million acres to oil and gas leasing and development.  The ROD asserts that the new plan "best supports the policy, purposes and requirements" of Executive Order 14153, Secretarial Order 3422, and the Reconciliation Act, and that the Congressional Review Act resolution prohibits BLM from selecting the no-action alternative.

123.    The 2025 IAP states that the 2020 EIS and the 2025 EA together are expected to satisfy NEPA for a first lease sale and future lease sales through at least 2045.

124.    The 2025 EA similarly states that the 2020 EIS and the analysis contained in the 2025 EA are intended to satisfy NEPA for lease sales through at least 2045.

125.    The 2025 EA does not include additional analysis of lease-sale-specific alternatives.

126.    The 2025 IAP opens approximately 6.8 million more acres to oil and gas leasing in the Reserve, affecting many special areas and the values they protect.  The plan also allows most types of new infrastructure on over 13 million acres, with an additional five million acres open to certain types of infrastructure such as essential pipeline crossings and roads.

127.    The 2025 IAP opens all of the previously protected Teshekpuk Lake Special Area to oil and gas leasing, with 132,000 acres deferred for ten years.  Although

the BLM designated some areas, including Teshekpuk Lake itself, as subject to no surface occupancy leases, the BLM did not retain this requirement for a large portion of land in the Teshekpuk Lake Special Area.  Additionally, certain types of surface disturbing activities, including the use of seismic trucks to survey for oil and gas deposits, can still occur on leases subject to no surface occupancy stipulations.

128.    The 2025 IAP also opens much of the previously protected Teshekpuk Lake Special Area to new infrastructure.  Teshekpuk Lake, and its immediately surrounding lands, is the only area within the special area that is completely unavailable to most types of new commercial infrastructure.  Many of the coastal areas north and northeast of the lake are now open to new commercial infrastructure without restrictions. The remaining coastal portion of the Teshekpuk Lake Special Area is open to essential pipeline crossings or essential coastal infrastructure.  The 2025 IAP also eliminates the southern portion of the Teshekpuk Lake Special Area, which includes lands close to existing development.

129.    Opening the Teshekpuk Lake Special Area to oil and gas leasing and industrial infrastructure could have significant adverse impacts for the millions of birds from all over the world that nest there.  These birds are vulnerable to the effects of oil and gas exploration and development.  Gravel mining and deposition necessary for constructing oil and gas infrastructure destroys bird habitat, encroaching upon molting areas for brant and nesting grounds for ducks, geese, and shorebirds near Teshekpuk Lake.  Aircraft flying at low altitudes may disturb molting geese near the lake.  Molting

demands energy and leaves geese flightless, making them especially vulnerable to disruptions and predation, and some never become habituated to human activities.

130. Exploration activities could lead to the construction of ice roads and pads, which draws down water in lakes and waterbodies used by birds, including loons and eiders. Even with restrictions, water withdrawals could exceed the natural recharge rate of lakes, resulting in lower water levels that can affect nesting habitats and food availability for birds. Ice roads and pads, vehicle traffic, and seismic exploration can interfere with natural drainage and compact vegetation that birds use as habitat.

131. Water withdrawals from tundra lakes can also adversely affect fish, including by reducing oxygen-bearing waters for overwintering fish. Low oxygen levels can result in mass mortality events and affect growth, reproduction, and long-term viability of fish that are not killed. The impacts from water withdrawals can last into the spring and summer by reducing the interconnectivity of lakes and streams. Lower water levels can result in reduced streamflow and prevent fish from migrating between wintering, spawning, and foraging habitats. Any effects to tundra lake fish can cascade through the ecosystem, including effects on migratory birds for which tundra lake fish are an important food source.

132. The 2025 IAP also opens the southern and eastern portions of the Utukok River Uplands Special Area to oil and gas leasing as well as commercial infrastructure. These areas overlap with the Western Arctic Herd's calving habitat and summer movement corridor.

133.    Allowing oil and gas leasing and commercial infrastructure, including pipelines, in key caribou habitat in the Teshekpuk Lake Special Area could have significant adverse effects on caribou.  Leasing and infrastructure could cause shifts in distribution, potentially driving caribou to low quality habitats, and causing reduced calf survival and affecting herd growth rates.  Oil and gas leasing and infrastructure in the Teshekpuk Lake Special Area could displace caribou from areas that are essential for calving, rearing, insect relief, and migration.  Pipelines, roads, and other types of infrastructure could also slow migrating caribou and prevent them from reaching calving habitats, high-quality foraging grounds, or traditional hunting grounds.  Caribou in the Reserve are already experiencing impacts from development in and around the Reserve such as the Willow Development in the eastern portion of the Reserve.

134.    Oil and gas exploration activities could also disturb or displace caribou overwintering in the Reserve.  Foraging opportunities are limited during the winter and caribou rely on body stores of energy for survival and gestation.  Disturbances can lead to flight responses in caribou, causing them to expend additional energy.  This additional energetic cost may lead to loss of body mass and depletion of vital energy reserves.  Any extra expenditure of energy that caribou undertake as a result of interaction with oil and gas activities is of concern as reproductive success in caribou is strongly correlated with nutritional stress.  Late winter body mass of female caribou has been strongly linked to calf production and survival, potentially influencing population growth rates.

135.    Because the 2025 IAP eliminates part of the Teshekpuk Lake Special Area,

the impacts from existing and future exploration and development activities will be amplified. The BLM will no longer have to afford maximum protection to caribou, molting geese, and shorebirds from oil and gas projects in the excluded lands.

136.    The 2025 IAP opens areas for leasing along the coastal and lagoon areas of the Reserve. Opening these coastal and lagoon areas to oil and gas activities may significantly affect wildlife, including birds, marine mammals, and caribou, as well as the people who depend on these animals. The 2025 IAP significantly increases the probability that infrastructure development, seismic surveying, and other exploration activity may interfere with polar bear denning habits. Seismic surveys coincide with polar bear denning during the winter. The presence of seismic trucks increases the risk of polar bear mortality through collapsed dens. Additionally, the noise from seismic surveys can cause polar bears to prematurely abandon their dens, leading to reduced survival of cubs. Given the precarious status of the SBS population of polar bears and the foreseeable significant cumulative effects from activity, including the existing Willow project in the Reserve and Arctic National Wildlife Refuge oil exploration and development, disturbance of even one denning polar bear could have significant consequences for the population.

137.    By eliminating the Colville River Special Area, the 2025 IAP has the potential to significantly affect the raptors that depend on it. Industrial infrastructure located near the Colville River could compromise raptor nest sites and impair foraging habitats such as ponds, lakes, wetlands, and streambanks. Gravel mining from cliffs

along the river would likely destroy nesting habitat. Power lines can electrocute raptors. Motorized vehicles, aircraft, heavy equipment, and seismic surveys may disturb nesting Arctic peregrine falcons and gyrfalcons. Without special area protections, these impacts will be amplified. BLM will no longer have to afford raptors maximum protection when evaluating existing and future projects in the Colville River Special Area.

## X.    The 2025 biological opinion

138.    BLM engaged in consultation with the Service and National Marine Fisheries Service prior to issuing its ROD to determine whether the 2025 IAP would jeopardize the continued existence of listed species or result in the destruction or adverse modification of their critical habitat.

139.    On July 31, 2025, the Service submitted its biological opinion to the BLM for the 2025 IAP. The biological opinion purports to address potential impacts from the 2025 IAP on threatened Spectacled Eiders, Alaska-breeding population of Steller's Eiders, and polar bears.

140.    For polar bears, the biological opinion describes the dire circumstances facing the species, especially the SBS population. Polar bear populations are declining and that decline is projected to accelerate due in part to loss of the bears' essential sea ice habitat. Because of the loss of sea ice habitat, terrestrial denning is increasing in the Reserve and is likely to continue to increase over the 70-year period of analysis.

141.    The biological opinion acknowledges that polar bears are particularly vulnerable to seismic exploration and other oil and gas activities when they are denning

with cubs and that disturbance from such activities conducted pursuant to the 2025 IAP could lead to den abandonment by maternal polar bears and the death of their cubs.

142.    The biological opinion relies in part on an email from BLM, sent in June 2025, to estimate a substantially larger area likely to be affected by seismic surveys than BLM disclosed in the 2020 EIS or 2025 EA.

143.    There are approximately 3,465 km² of polar bear terrestrial denning habitat in the Reserve, all of which is open to leasing under the 2025 IAP and potentially subject to impacts from seismic surveys.

144.    The Service concludes that as a result of activities under the 2025 IAP, 103 denning sows will be disturbed, leading to the death of 43 cubs and the reduced survival probability of 177 cubs.  However, the Service acknowledges that these estimates may be low because they do not account for the likely increase in terrestrial denning, and exposure to oil and gas activities, over the 70-year timeframe for the analysis.

145.    Despite these and other threats to polar bears, the Service's biological opinion concludes that the 2025 IAP is not likely to jeopardize polar bears or destroy or adversely modify their critical habitat.

146.    Additionally, despite the Service's conclusion that 103 maternal dens will be disturbed under the IAP, leading to the death of 43 cubs and the reduced survival probability of another 177 cubs, the biological opinion does not include an incidental take statement for the take the agency estimates will occur under the IAP.

## XI.    The 2026 lease sale

147.    On October 22, 2025, BLM issued a call for nominations and comments on all available unleased tracts for an upcoming oil and gas lease sale in the Reserve. 90 Fed. Reg. 48446, 48446 (Oct. 22, 2025).

148.    Plaintiffs and other groups submitted comments urging BLM to conduct an EIS as required by NEPA before offering tracts for lease, to limit acreage offered, and to not offer tracts for lease in the most ecologically and culturally important areas within the Reserve, including within special areas as designated under the 2013 and 2022 IAPs.

149.    On February 11, 2026, BLM published a Notice of 2026 National Petroleum Reserve—Alaska Oil and Gas Lease Sale ("Notice of Sale") in the Federal Register, 91 Fed. Reg 6248, 6248 (Feb. 11, 2026), and issued a Detailed Statement of the Sale ("Statement of Sale") on the agency's website.

150.    The Notice of Sale offers more than 600 tracts covering approximately 5.5 million acres, including nearly all of the Teshekpuk Lake Special Area and significant portions of the purportedly eliminated Colville River Special Area.  The following map depicts the tracts offered:



151.    The sale includes core areas of the Teshekpuk Lake Special Area that have not previously been offered for lease, and that have been closed to oil and gas leasing for most of the last four decades.

152.    Neither the Notice of Sale nor the Statement of Sale provides any rationale or justification for BLM's choice of tracts to offer.

153.    Neither the Notice of Sale nor the Statement of Sale acknowledge BLM's previous fact-based determinations that many of the areas now offered for lease should be closed to oil and gas leasing to protect significant resource values or offers any explanation for departing from those previous findings.

154.    BLM appears to rely on only the 2020 EIS and 2025 EA as providing the NEPA analysis for the 2026 lease sale.  The agency did not post or make available any

further EIS or EA.

155.    The lease sale bid opening is scheduled for 10 a.m. Alaska Standard Time ("AKST") on March 18, 2026, and bids are due by 4 p.m. AKST on March 16, 2026.

## CLAIMS FOR RELIEF

## COUNT I

156.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 155.

157.    The Property Clause of the Constitution gives Congress the exclusive power to manage the United States' lands and associated resources.  U.S. Const. art. IV, § 3, cl. 2.

158.    Executive power over federal public lands and resources "must stem either from an act of Congress or from the Constitution itself."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952); *see also Sioux Tribe of Indians v. United States*, 316 U.S. 317, 326 (1942).

159.    The Reserves Act designates the Teshekpuk Lake and Utukok River Uplands Special Areas as areas within which any activities must be conducted in a manner that assures the maximum protection of "significant subsistence, recreational, fish and wildlife, or historical or scenic value[s]."  42 U.S.C. § 6504(a).

160.    Through the Reserves Act, Congress delegated authority to the Secretary of the Interior to designate other areas "containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value" for "maximum protection."  42 U.S.C.

§ 6504(a).

161.    BLM's implementing regulations for the Reserves Act recognize the Secretary's authority to designate areas identified "as having significant subsistence, recreational, fish and wildlife, or historical or scenic value" as "special areas" and provide a process for the Secretary to consider "[r]ecommendations for additional special areas." 43 C.F.R. § 2361.10(b), (c).

162.    The Secretary has exercised this authority, through BLM, to expand the Teshekpuk Lake and Utukok River Uplands Special Areas, and to designate special area boundaries for the Colville River, Kasegaluk Lagoon, and Peard Bay Special Areas.

163.    The Reserves Act does not delegate authority to the Secretary to de-designate special areas or remove lands from these areas once designated.

164.    BLM's implementing regulations do not recognize authority to, or provide process for, de-designating or removing lands from special areas.

165.    No other source of authority permits the Secretary or any executive branch officer to reverse a designation or remove lands from an area once designated under section 6504(a) of the Reserves Act.

166.    The 2025 IAP states it removes lands from the Teshekpuk Lake Special Area and eliminates the Colville River Special Area.

167.    BLM's decision to remove lands from the Teshekpuk Lake Special Area and to eliminate the Colville River Special Area is without authority, in violation of the Property Clause of the Constitution, U.S. Const. art. IV, § 3, cl. 2, the APA, 5 U.S.C.

§ 706, and the Reserves Act, 42 U.S.C. § 6504(a).

## COUNT II

168.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 155.

169.    The Reserves Act authorizes the Secretary of the Interior to designate areas "containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value" for "maximum protection."  42 U.S.C. § 6504(a).

170.    The Secretary has exercised this authority, through BLM, to expand the Teshekpuk Lake and Utukok River Uplands Special Areas and to designate special area boundaries for the Colville River, Kasegaluk Lagoon, and Peard Bay Special Areas.

171.    The APA requires that federal agency decision-making not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  When an agency reverses positions, the agency must provide good reasons for doing so, including a reasoned explanation for disregarding any facts and circumstances that underlaid its prior policies.  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Organized Vill. of Kake v. U.S.D.A.*, 795 F.3d 956, 967 (9th Cir. 2015) (en banc).

172.    The Teshekpuk Lake Special Area was created, and subsequently expanded, to protect areas of special subsistence, ecological, and environmental significance, including important habitat for a large number of migratory and other

waterbirds, important caribou habitat, important shorebird habitat, subsistence hunting and fishing activities, Pik Dunes, and overwintering habitat for fish.

173.    The Colville River Special area was established to protect important habitat for raptor and other bird species, including the Arctic peregrine falcon, important habitat for moose, important habitat for fish, important subsistence activities, important recreational activities, world-class paleontological deposits, and significant cultural resources.

174.    The 2025 IAP removes lands from the Teshekpuk Lake Special Area and eliminates the Colville River Special Area.

175.    The 2025 IAP and 2020 EIS state that the southern portion of the Teshekpuk Lake Special Area is no longer necessary because the required operating procedures intended to protect Yellow-billed Loons in the area now apply to the entire Reserve.

176.    Neither the 2025 IAP nor the 2020 EIS finds that the removed areas of the Teshekpuk Lake Special Area no longer contain the significant resource values it was designated to protect, and BLM does not otherwise acknowledge that its decision is contrary to the findings supporting the previous Teshekpuk Lake Special Area boundaries or explain its decision in light of this conflict.

177.    The 2025 IAP and 2020 EIS state that the Colville River Special Area is no longer necessary because the special area's required operating procedures for raptors now apply to the entire Reserve.

178.    Neither the 2025 IAP nor the 2020 EIS finds that the Colville River Special Area no longer contains the significant resource values it was designated to protect, and BLM does not otherwise acknowledge that its decision is contrary to the findings supporting the creation of the Colville River Special Area or explain its decision in light of that conflict.

179.    In the EIS for the 2013 IAP, BLM stated it would not eliminate or reduce the size of special areas because there was no information indicating that current special areas did not meet the Reserves Act's statutory criteria of holding significant resources.

180.    To the extent BLM has any authority to remove lands from special areas, by removing lands from the Teshekpuk Lake Special Area and eliminating the Colville River Special Area without addressing whether the affected lands contain significant subsistence, recreational, fish and wildlife, or historical or scenic values, and without acknowledging that, or providing an adequate explanation why, the 2025 IAP disregarded the factual findings supporting the previous special area boundaries, the 2025 IAP violates the Reserves Act, 42 U.S.C. § 6504(a), and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. §§ 702, 706.

## COUNT III

181.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 155.

182.    NEPA requires federal agencies to take a hard look at environmental consequences and consider less-damaging approaches before approving actions involving

*Center for Biological Diversity et al. v. Burgum et al.,*
Case No. 3:20-cv-00206-SLG                                                45

public resources. 42 U.S.C. § 4332. NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). This statement, known as an EIS, must assess all reasonably foreseeable environmental effects of the proposed action and evaluate a reasonable range of alternatives. *Id.* § 4332(2)(C)(i), (iii). The agency's analysis must include accurate scientific analysis, expert agency comments, and public scrutiny. NEPA requires that an EIS engage in reasonable forecasting.

183. NEPA requires agencies to study, develop, and describe a reasonable range of alternatives to any proposed action. 42 U.S.C. § 4332(2)(C)(iii), (F), (H). An agency's consideration of alternatives serves the twin purposes of fostering informed decision-making and public participation. The existence of reasonable but unexamined alternatives renders the agency's environmental analysis inadequate.

184. NEPA applies whenever an agency makes an irretrievable commitment of resources, including when an agency sells leases in the Reserve.

185. Agencies may make narrower, future decisions together with programmatic planning decisions in a single programmatic document. However, they must undertake the analysis required by NEPA for the future decisions, including the consideration of reasonable alternatives to and impacts from the proposed action.

186. The 2020 EIS states that its purpose is to revise the 2013 IAP. The 2020 EIS analyzes environmental impacts of five programmatic land management alternatives with different levels of land opened to leasing and new infrastructure over the 70-year

expected life of the IAP.

187. The 2020 EIS originally stated that it was intended to fulfill NEPA requirements for leases sales conducted at least through December 2039 and potentially thereafter.

188. In June 2025, BLM issued a draft EA, proposing to select Alternative E from the 2020 EIS and stating that the 2020 EIS and the 2025 EA together are intended to satisfy NEPA for lease sales through at least 2045.

189. On December 22, 2025, BLM issued a final EA and a ROD selecting Alternative E. The final EA and ROD state that the 2020 EIS and the 2025 EA together are expected to satisfy NEPA for a first lease sale and future lease sales through at least 2045.

190. Neither the 2020 EIS nor the 2025 EA analyzes the alternatives to or impacts from individual lease sale decisions, and neither document discusses how BLM will decide whether, when, or where to offer tracts for sale.

191. Without adequate analysis of leasing alternatives or impacts from lease sale alternatives, the 2020 EIS and 2025 EA could allow future leasing decisions to evade the level of analysis required by NEPA.

192. On February 11, 2026, BLM issued the Notice of Sale scheduling the lease sale for March 18, 2026.

193. The Notice of Sale offers more than 600 tracts covering approximately 5.5 million acres, including nearly all of the Teshekpuk Lake Special Area and significant

portions of the purportedly eliminated Colville River Special Area.

194. BLM appears to rely on only the 2020 EIS and 2025 EA as providing the NEPA analysis for the 2026 lease sale. The agency has not posted or made available any new environmental analysis under NEPA for the lease sale decision considering alternatives to the proposed sale, including a reasonable alternative to not lease tracts within areas designated as special areas under the 2013 and 2022 IAPs.

195. Because the 2020 EIS and 2025 EA do not consider alternatives to any lease sale or the reasonably foreseeable environmental impacts of any lease sale or alternatives, the 2020 EIS and 2025 EA are inadequate under NEPA, 42 U.S.C. § 4332(2), and the APA, 5 U.S.C. §§ 702, 706, to support a lease sale decision.

196. Defendants' action to hold a lease sale in the Reserve without considering alternatives for the lease sale decision and the reasonably foreseeable environmental impacts from the lease sale and alternatives violates NEPA, 42 U.S.C. § 4332(2), and the APA, 5 U.S.C. §§ 702, 706.

**COUNT IV**

197. Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 155.

198. NEPA requires BLM to supplement a previous environmental analysis when there is significant new information or circumstances relevant to the environmental concerns of a proposed action or bearing on its potential impacts. 42 U.S.C. § 4332(2).

199. BLM was aware of significant new information and circumstances relevant

to the environmental concerns and impacts of its 2025 IAP and lease sale decisions.

200.    Plaintiffs and other groups provided extensive information to BLM in April 2025 that, among other concerns, described the need to update the 2020 EIS's analysis of oil development potential, impacts to caribou, and impacts from winter seismic activities.

201.    The 2025 EA acknowledges this new information, but it dismisses all of it as insignificant, asserting without explanation that none of the information would change the agency's conclusions.

202.    Defendants' failure to consider and explain whether new information and circumstances relevant to environmental concerns and impacts of its decision required preparation of a supplemental EIS violates NEPA, 42 U.S.C. § 4332(2) and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. §§ 702, 706.

## COUNT V

203.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 155.

204.    The Reserves Act requires that any activities authorized within designated special areas must be conducted in a manner that assures the maximum protection of "significant subsistence, recreational, fish and wildlife, or historical or scenic values," 42 U.S.C. § 6504(a), and BLM's implementing regulations provide that maximum protection measures will be taken on all actions within the Utukok River Uplands, Colville River, and Teshekpuk Lake Special Areas, 43 C.F.R. § 2361.10(b).

205.    The APA requires that federal agency decision-making must not be

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When an agency reverses positions, the agency must provide good reasons for doing so, including a reasoned explanation for disregarding any facts and circumstances that underlaid its prior policies. *Fox Television Stations, Inc.*, 556 U.S. at 515-16; *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.*, 463 U.S. at 43; *Organized Vill. of Kake*, 795 F.3d at 967.

206.    The Notice of Sale offers more than 600 tracts covering approximately 5.5 million acres, including nearly all of the Teshekpuk Lake Special Area and significant portions of the purportedly eliminated Colville River Special Area.

207.    The sale includes areas which BLM has previously found should be closed to oil and gas leasing to protect critically important wildlife habitat and subsistence uses consistent with the agency's obligation to mitigate impacts to surface resources and provide maximum protection to significant resource values within special areas.

208.    Neither the Notice of Sale nor the Statement of Sale provides any rationale or justification for BLM's choice of tracts to offer.

209.    These documents do not explain or justify BLM's decision to offer previously closed lands for lease in light of its previous contrary findings that these lands should not be open to leasing in order to mitigate impacts to surface resources or provide maximum protection to significant resource values. Nor do they demonstrate that BLM's decision to offer for lease previously closed lands within special areas is consistent with the agency's obligation to provide maximum protection to significant subsistence,

recreational, fish and wildlife, or historical or scenic values in those areas.

210.    BLM's decision to offer for lease previously closed lands without acknowledging BLM's previous findings that these lands should not be open to leasing or justifying the decision to offer them for leasing in the face of its prior conclusions to the contrary, and without demonstrating that leasing lands within special areas, and within areas unlawfully eliminated from special area status, is consistent with the agency's obligation to provide maximum protection to significant subsistence, recreational, fish and wildlife, or historical or scenic values violates the Reserves Act, 42 U.S.C. § 6504(a), and is arbitrary, capricious, and contrary to law in violation of the APA, 5 U.S.C. §§ 702, 706.

## COUNT VI

211.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 155.

212.    Under section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), any agency authorizing an action that may affect formally listed threatened or endangered species or their designated critical habitat must ensure that the action is not likely to jeopardize the continued existence of the species or destroy or adversely modify their critical habitat. To accomplish this, the agency must consult with the Secretary of the Interior and/or Commerce—depending on the species involved—using the best scientific and commercial information available. *Id.* After consultation and before initiation of the agency action, the Secretary must issue a biological opinion detailing how the action

affects the listed species or critical habitat. *Id.* § 1536(b)(3)(A).

213. The biological opinion must include a determination from the consulting agency on whether a proposed action is "[l]ikely to jeopardize" or "[n]ot likely to jeopardize . . . the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h)(1)(iv).

214. A jeopardy analysis requires the agency to consider the aggregate effect of past and ongoing human activities that affect the current status of the listed species or critical habitat ("environmental baseline"), all consequences of the proposed action to listed species or critical habitat, including those that occur later in time ("effects of the action"), and the effects of future state and private activities that are reasonably certain to occur ("cumulative effects"). 50 C.F.R. §§ 402.02, 402.14(g). An agency must consider all of these factors in context of the current status of the listed species or its critical habitat. *Id.* § 402.14(g)(2). When a species is already jeopardized by baseline conditions, an agency may not act to cause additional harm that deepens the jeopardy. Mitigation relied upon in a biological opinion must be unambiguous and reasonably certain to happen.

215. If the consulting agency concludes that a proposed action will jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, the biological opinion must include "reasonable and prudent alternatives" to avoid jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

216.    If the consulting agency concludes that a proposed action is reasonably certain to result in incidental take, the biological opinion must include an incidental take statement that specifies the impact of the action, generally by setting a numeric limit on take, and identifying "reasonable and prudent measures" that will minimize the impact of that take, among other requirements.  16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(g)(7).

217.    The Secretary of the Interior is the relevant Secretary for consultation regarding potential impacts to polar bears, which are listed as threatened under the ESA, and their critical habitat, and conducts consultations and issues biological opinions by and through the Service.

218.    For the 2025 IAP, BLM and the Service engaged in ESA consultation in part because they agreed that the IAP is an action that may affect polar bears.  The Service acknowledges that this consultation had to evaluate whether the effects of the action, when added to cumulative effects and the environmental baseline, are likely to jeopardize the continued existence of polar bears or adversely modify their designated critical habitat.

219.    The polar bears of the SBS population are declining and projected to decline even more in the future.  As the Service acknowledges, these declines are due in part to loss of the bears' essential sea ice habitat.  The Service acknowledges that because of this sea ice loss, terrestrial denning is increasing in the Reserve and is likely to continue to increase over the 70-year period of analysis.

220.     Polar bears are particularly vulnerable to seismic exploration and other oil and gas activities when they are denning with cubs.  The Service acknowledges that disturbance from such activities conducted pursuant to the 2025 IAP could lead to den abandonment by maternal polar bears and the death of their cubs.

221.     The Service acknowledges that minimizing such adverse impacts on polar bears and their denning habitat would require application of mitigation measures.  Nevertheless, the Service's analysis relied on nonbinding and ineffective mitigation measures.  In doing so, it failed to comprehensively incorporate the best available science and data into its decision.  For example, the Service assumed that developers will conduct aerial infrared surveys to locate dens and that the surveys will be effective at a certain rate, even though they are not required under the 2025 IAP and there is robust evidence indicating that such surveys would be much less effective than assumed at detecting dens.

222.     In addition, the Service improperly failed to consider multiple important factors in its jeopardy analysis.  In doing so, it failed to comprehensively incorporate the best available science and data into its decision.  It also failed to properly consider polar bears' environmental baseline, the 2025 IAP's environmental effects, and the cumulative effects on the species as required.  For example, when it concluded that a limited number of cubs will die as a result of the 2025 IAP, the agency failed to factor in the broader cumulative decline of polar bears to which the 2025 IAP would contribute.  It also failed to consider that terrestrial denning is likely to increase in the Reserve over the period covered by the biological opinion.

223. As a result of all these failures, the Service could not and did not accurately analyze how the 2025 IAP would likely affect polar bears and their critical habitat.

224. However, the Service issued a biological opinion for the 2025 IAP concluding that it is not likely to jeopardize the continued existence of polar bears or destroy or adversely modify their critical habitat. In making that conclusion, the Service failed to incorporate the best scientific and commercial information, ignored important factors, and relied on nonbinding and ineffective mitigation measures.

225. Additionally, even though the biological opinion concludes that 103 maternal dens will be disturbed under the 2025 IAP, leading to the death of 43 cubs and the reduced survival probability of another 177 cubs, the Service issued a biological opinion that fails to include an incidental take statement for the take the agency estimates will occur under the IAP.

226. The Service violated 16 U.S.C. § 1536(a)(2) by failing to use the best scientific and commercial information available when consulting to ensure that the 2025 IAP is not likely to jeopardize the continued existence of polar bears or adversely modify their critical habitat.

227. The Service violated 16 U.S.C. § 1536(b)(3)(A) by issuing an inadequate biological opinion that fails to include a comprehensive, predictive analysis accurately detailing how the 2025 IAP could adversely affect polar bears or their critical habitat.

228. The Service violated 16 U.S.C. § 1536(b)(4) and 50 C.F.R. § 402.14(g)(7) by failing to include an incidental take statement with its biological opinion. While the

agency's regulations implementing the ESA sometimes allow it to not include an incidental take statement for programmatic consultations, 50 C.F.R. § 402.14(i)(7), the regulation does not apply here, where the agency has determined the take at issue is "reasonably certain to occur," *id.* § 402.14(g)(7).

229.    The Service violated the APA, 5 U.S.C. § 706(2)(A), by arbitrarily concluding that the 2025 IAP is not likely to jeopardize the continued existence of any threatened or endangered species or adversely modify its critical habitat, despite the various deficiencies in its analysis.  The Service violated the APA, *id.*, by arbitrarily failing to include an incidental take statement despite determining take is reasonably certain to occur under the 2025 IAP.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

A.      Declare that Defendants have violated, with respect to the Secretary of the Interior and BLM Defendants, the Constitution, Reserves Act, NEPA, and the APA, and, with respect to Fish and Wildlife Service Defendants, the ESA and the APA, and further declare that the actions set forth above are arbitrary, capricious, and not in accordance with law;

B.      Declare that the 2020 EIS and 2025 EA fail to fulfill the requirements of NEPA for the purpose of authorizing lease sales in the Reserve;

C.      Vacate the 2020 EIS and 2025 EA;

D.      Vacate the 2025 IAP;

E.   Vacate the 2020 IAP;

F.   Vacate the Service's 2025 biological opinion;

G.   Set aside any actions taken by Defendants in reliance on the 2020 EIS or 2025 EA;

H.   Enjoin BLM from holding any lease sale or issuing leases in reliance on the 2020 EIS or 2025 EA;

I.   Vacate any leases issued as a result of the 2026 lease sale;

J.   Enjoin any ground-disturbing activity on leases issued as a result of the 2026 lease sale; and

K.   Grant such other relief as the Court considers just and proper, including Plaintiffs' costs of this action and reasonable attorneys' fees.

Respectfully submitted this 17th day of February, 2026.

*s/ Jeremy Lieb*
Jeremy C. Lieb (Alaska Bar No. 1810088)
EARTHJUSTICE

*s/ Ian S. Dooley*
Ian S. Dooley (Alaska Bar No. 2006059)
EARTHJUSTICE

*s/ Erik Grafe*
Erik Grafe (Alaska Bar No. 0804010)
EARTHJUSTICE

*s/ Eric Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs Center for Biological Diversity and Friends of the Earth*